**In re Robert Amos BOWLING and Gladys Marie Bowling, Debtors.**

**Bankruptcy No. 84–01319–SW–S–2–11.**

United States Bankruptcy Court,
W.D. Missouri, S.D.

Aug. 27, 1986.

Gary A. Love, Springfield, Mo., for debtors.

James L. Bowles, Springfield, Mo., for Boatmen's Bank of Aurora.

David DeTar Newbert, Kansas City, Mo., for amicus curiae U.S. Dept. of Agriculture.

## MEMORANDUM OPINION AND ORDER

FRANK W. KOGER, Bankruptcy Judge.

### HISTORY

Robert A. Bowling and Gladys M. Bowling filed their joint petition under Chapter 11 in 1984. In 1985 a plan of reorganization was proposed and a hearing seems to have been held on the matter as to confirmation. However, the record is silent as to what occurred. In any event, no confirmation order was ever entered by the Honorable Joel Pelofsky and this Court inherited the case on February 14, 1986.

On or about the first day of May, 1986, debtors applied for permission to participate in the "new" dairy diversion program, hereinafter "dairy termination program", 7 U.S.C. Section 1446(d)(3)(A)(i). The Court issued an order to the creditors to show cause, if any they had, why the application should not be granted. No cause was shown, and permission was granted. Debtors were selected to participate in said program; branded their cows; sent them to slaughter; and received $13,773.72 as slaughter price on the cattle secured to Boatmen's Bank. That money was paid to Boatmen's Bank and has been applied against the secured note.

Pursuant to the dairy termination program, debtors then received $83,707.20 (or 80%) of the total award they are to get and they will receive $5,231.70 each year for four years until they have received the full sum of $104,634.00 to be paid. The funds so far received have been paid into a money market fund and held for order by this Court.

Debtors owned and operated a 57 acre dairy farm. The ground has been operated some ten years by the debtors as a dairy farm and was likewise operated by Mr. Bowling's father before debtors purchased it from him. The Boatmen's Bank has three deeds of trust against the real estate, which in addition to the farm, included another six acres with a 'rent' house on it Boatmen's also had a perfected security interest in the farm equipment, and 41 cows, 13 heifers and 4 calves. At a hearing in September of 1985, Judge Pelofsky had determined the following values:

| ITEM | VALUE |
| --- | --- |
| 57 acre farm | $26,000.00 |
| 6 acres and house | 18,000.00 |
| farm equipment | 2,700.00 |
| cattle secured to bank | 28,575.00 |
| undersecured amount owed to Boatmens | 28,000.00 |

As to the dairy termination program, a brief summary may outline the program as to practical results and practical programs. Under a formula set up by the Food Security Act, 7 U.S.C. Section 1446(d)(3)(A)(i) of 1985, selected dairymen were allowed to participate. They were required to slaughter all their dairy cows, cease all dairy operations, both personally and on the real estate where their milk barn had been located. This ban against personal participation in dairy operations was absolute, except for day labor without interest in the operation, for a period of five years. The prohibition against use of the "milk facility" portion of the real property (or use of any personal property for dairying on the real property) is likewise absolute for a period of five years.

Participation *by the farmer* in any dairy operation anywhere (other than as a salaried employee without any interest in the

operation) or use of the real estate for any type of dairying operation *by anyone*, within five years, was and is a direct violation of the act. Such acts may result in a forfeiture of all money paid or to be paid under the act. The government may sue the farmer to recover the money already received. It is, therefore, clear that there are two encumbrances on the money paid: first—the labor factor directly attributable to the farmer and controllable by him; second—the use of the real estate by any one and controllable by the farmer only so long as he owns and controls the real estate. The farmer may draw down up to 80% of the funds immediately and 5% per year thereafter or may draw down a smaller immediate payment and a larger payment per year for four years.

The questions presented to the Court for decision are as follows:

1. Are the funds realized by a dairy farmer in Chapter 11 from the dairy termination program property of the estate?

2. If they are property of the estate—

(A) To whom should the slaughter money be paid, the farmer or the lienholder?

(B) To whom should the initial payment and the annual payments be attributed?

(I) the farmer?

(II) the lienholder on the cattle?

(III) the lienholder on the milking equipment?

(IV) the lienholder on the real estate?

3. Does the Court have the ability to impress (in effect) a covenant running with the land on the real estate if it is sold or foreclosed?

4. What restrictions should the Court apply to the money paid to and received by the debtor-farmer?

## DISCUSSION

■ The answer to Question 1 above is the easiest to formulate. Property of the estate is defined in Section 541(a)(6) as "proceeds, product, offspring, rents and profits of or from property of the estate,

except such as are earnings from services performed by an individual debtor after the commencement of the case". Further, Section 541(a)(7) adds a further definition: "any interest in property that the estate acquires after the commencement of the case". Rather clearly the money received from the ASC Dairy Termination Program falls within the quoted sections. Debtors' counsel, sans citation or development, makes the argument that the funds come from a contract that is a covenant not to compete and that the contract involves the personal services of the debtor. Were such a contention sound, the Court would be faced with a far different problem. Debtor is not required to abstain from working in any dairy operation and he can go to work tomorrow in any phase of dairying as long as he has no ownership interest. Furthermore, the obtaining of the funds also rests upon the slaughter of the herd (which is clearly property of the estate) and not using the real estate or dairy barn (again clearly property of the estate). It is not the personal services of the debtor (or its obverse) that is restrained, merely the ownership interest. *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515, tells us that Section 541(a) is to be given a broad reading in determining property of the estate. See also *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984).

The answer to Questions 2(A) and 2(B)(I) & (II) above is somewhat more difficult. The evidence before the Court at the adequate protection and plan stage (September and November, 1985) indicated a value of $28,575.00 and Judge Pelofsky apparently so ruled. The slaughter price of the same herd in March or April of 1986 produced $13,773.72. That sum has been paid to the lienholder. Under the ASC Dairy Termination Program, the farmer cannot sign up and cannot receive any funds until after the last animal in the herd is slaughtered. Evidence was adduced that indicates the fair market value of a dairy cow is $600.00. The value of that same cow for slaughter is less than one-half as much.

■ Because the program is new, there are no cases or precedents under this legislation. The Court believes, however, that rulings under the previous PIK Plan and Dairy Diversion Program offer some guidance. See, e.g., *In re Sunberg*, 729 F.2d 561 (8th Cir.1984); *In re Hollie*, 42 B.R. 111 (Bankr. MD Ga.1984). There the better reasoned cases seemed to establish that the secured lender's lien extended to the PIK commodities or PIK and Dairy Diversion payments received by the farmer. To the Court, that analogy is appropriate here. Further the Court believes that it is the debtor who makes the choice to participate in the program, not the secured lender, and the loss from $600.00 per animal to less than $300.00 per animal is strictly because of the debtors' decision. To have the debtor carry out such a decision, one of the essential elements to receiving $104,634.00, and then afford the creditor only the slaughter price is neither fair nor equitable. Therefore, at least as to the fair market value of the dairy herd, as a dairy herd, the perfected secured creditor must be compensated.

The Court is required to determine the amount that should be awarded the cattle lienholder. The judgments of Judge Pelofsky as to value on adequate protection and/or the plan valuation are not res adjudicata as to value for this purpose. For an excellent discussion of the use prior determinations can be put to, see *In re Snowshoe Company, Inc.*, 789 F.2d 1085, (4th Cir.1986). Applying the principles therein enunciated, weight can be given to Judge Pelofsky's ruling as to value but it cannot be the sine qua non on which to base this decision.

The Court has considered the limited evidence propounded by the parties, namely that $600.00 per cow is a fair market value. The Court has also considered that the only count of the cattle is the 41 cows, 13 heifers and 4 calves, previously testified as being the correct number. Indulging in the presumption that a fact remains a fact until the contrary is shown, FRE Rule 301, Notes of Advisory Committee on Proposed Rules. See generally, *McCormick on Evidence*, Section 345 (2d Ed.1972); *Accord Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1579 (Fed.C.R.1984), the Court concludes that 41 cows times $600.00 is equal to $24,600.00 and that 13 heifers times $300.00 per head is equal to $3,900.00. The Court has no evidence that the 4 calves were still on premises or sold and is cognizant that calves have very limited value and rarely stay on a dairy farm for very long. The Court also realizes that the value of dairy cattle is not likely to have increased since September of 1985. Based on all the above, the Court determines that $28,575.00 is a reasonable figure for the value of the herd prior to slaughter.

Boatmen's, which had a perfected security interest in the dairy cattle for the amount of its $28,575.00 fair market value has received only $13,773.72—the price brought by the herd for slaughter as beef. Because the Court has determined that Boatmen's lien extended not only to the cattle but also to debtor's payments under the termination program, Boatmen's is entitled to compensation from the dairy termination fund for its deficiency from the sale of the cattle—$14,801.28.

■ For the same reason the milking equipment lienholder and the lienholder on real estate must be compensated to the extent that the value of their interests are diminished by debtor's participation in the dairy termination program. In this way, the approach to Question 2(B)(III) and (IV) will be similar to that taken above to resolve Question 2(B)(I) and (II). There is no question that debtors are taking property of value—land, equipment, cattle—which constitutes collateral for creditors' loans, disposing of it or restricting its use, and in turn receiving cash proceeds. If this case were outside bankruptcy then creditors could attach, garnish or have execution issue on proceeds as soon as those proceeds are received by the debtors. Governmental creditors could in fact offset the payments. But the automatic stay that prevents creditors from reaching said property or pro-

ceeds is conditioned upon debtors providing adequate protection to creditors.

The more difficult problem in answering (III) and (IV) is determining the extent to which the lienholders should be compensated. Creditors with secured interests in debtors' milking equipment and land are situated differently from the creditor whose claim was secured by debtor's cattle. The dairy termination program requires slaughter of the cattle, but it only places certain restrictions on the use of the milking equipment by the farmer and on the land previously used in milk production. The collateral of the cattle lienholder was completely destroyed, therefore entitling it to a payment of 100% of its claim. The collateral of the equipment lienholder and real estate lienholder is subject to certain restrictions, but it remains intact. In light of these restrictions, the Court must determine the degree to which creditors' interests in equipment and real estate have been diminished.

## EQUIPMENT

The termination program is least restrictive in its treatment of milk production equipment. It requires only that no milk can be produced at the dairyman's "milk production facility" (read milk barn) for a term of five years. Under the government program a dairyman would be able to remove the milking equipment from his facility and sell it to another farmer for use elsewhere. He could also use his "milk production facility", that is, his dairy barn and pens, for any purpose other than milk production, such as a shelter for beef cattle, polo ponies, or storage of feed. If he desired, he could pull down the entire barn and reassemble it on someone else's property for dairy production as long as he had no ownership in the relocated facility.

From the vantage point of the creditor with a secured interest in the equipment, his collateral will either lie dormant for five years or it will be sold. In the first case the creditor may request periodic adequate protection payments from the dairy termination proceeds for depreciation during five years of non-use. In the latter case, the creditor's interest follows the proceeds of the sale with any shortfall charged against the dairy termination proceeds. Creditor may also seek relief from the stay, adequate protection, or a Section 507(b) priority.

However, in this case, debtor has received value in exchange for restricting the use of his property. In effect, debtor has sold the government some of his bundle of property rights in real estate improvements and equipment: he has sold his right to use the property for dairy purposes and his right to sell the property *in place* for dairy purposes. Therefore, whatever diminution in value of such property that is directly attributable to those restrictions should be payable from the proceeds the debtor received from the sale of his rights. The five years of depreciation are attributable to debtor's sale of his right to use his property for five years. Similarly, any shortfall following sale of equipment that must be removed from the "milk production facility" before it can be used by another producer is attributable to debtor's sale of the right to sell the property in place. These proceeds are payable to the creditor to the extent of its security interest in the property. For example, if debtor received a $1,500.00 sale price for milking equipment which in place would have a fair market value of $2,700.00, the secured creditor is entitled to a $1,200.00 payment from debtor's dairy termination funds.

Until such time as the amount of prejudice to the equipment claim is determined upon submission of evidence to this Court, debtor shall be required to set aside the sum of $1,350.00 for the secured claim in the milking equipment.

## REAL ESTATE

Valuation of the diminution of creditor's $26,000.00 interest in debtor's 57 acres of real estate is an even more difficult matter. Lender extended credit based on the highest and best use to which debtor's land could be put—in this case, dairy farming. By participating in the dairy termination

program, debtor has sold two of his bundle of real estate property rights—his right to use his farm for milk production purposes for five years and his right to sell his farm to any one else for milk production purposes for five years. Note that the restriction is far more expansive than the second restriction discussed above in relation to equipment.

█ The restriction on land use does not run with the land. It is a contractual obligation between debtor and the government. Under the statute, the debtor is in total breach of his contract if the land is used by anyone for milk production purposes before the five year period expires. 7 U.S.C. Section 1446(d)(3)(A)(iv)(II). On breach the debtor must refund his entire dairy termination payment plus interest to the government. 7 U.S.C. Section 1446(d)(3)(A)(iv)(II). Neither the statute nor the regulations implementing the program, 51 Fed.Reg. 7,913 (1986) (to be codified at 7 C.F.R. Section 1430) make a distinction between voluntary and involuntary breaches. In a voluntary breach the debtor would either use his land for dairy production purposes himself or he would lease or sell the land to someone else with the understanding that it would be used for dairy production purposes. An involuntary breach could occur if debtor sells or leases his land subject to a condition that it not be used for dairy purposes and the tenant or new owner violates the condition. Debtor would still be in breach of his federal contract but he could seek indemnity from his tenant or the land's new owner for violation of the condition. The government would not be able to proceed against the tenant or new owner because there is no privity of contract.

The hardest case of all is presented by creditor foreclosure and sale to a third party who, before the five year period is up, engages in milk production on debtor's facility. The government cannot restrict creditor in sale of the property for its highest and best use. Privity of contract is lacking. Furthermore, any uncompensated government interference in the creditor's bundle of rights would be a taking in viola-

tion of the Fifth Amendment in the same way as it was in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

As discussed above, any use of the property for milk production following such a sale puts the debtor in breach of his dairy termination contract and would make him liable for repayment with interest of the entire amount of funds received from the government. This would be the natural course of events outside the Bankruptcy Court.

█ However, once debtor has sought the protection of bankruptcy and his dairy termination program proceeds become part of his estate to be distributed under the direction of the Court, the Court may require that precautions be taken to insure that the scenario just described does not occur. The Court, of course, may not absolutely prohibit the real estate lender from foreclosing on debtor's property for the five year period. *Radford*, supra. However, the Bankruptcy Court may stay foreclosure or otherwise subject the property in question to restrictions to the extent they are necessary for debtor's rehabilitation, *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937), provided that lender's interest is adequately protected.

Assuming that rehabilitation would be impossible if debtor was required to repay his dairy termination monies, the Court may take the steps necessary to protect debtor from such an eventuality. This necessarily requires some impairment of creditor's right to foreclose on default and dispose of the land to another dairy farmer within the five year period. *Wright*, supra, established that a creditor's foreclosure right may be delayed, provided that the creditor receives regular payments to protect it from possible loss. Fortunately, there is a less onerous means available in this case to preserve debtor's chance for rehabilitation while adequately protecting creditor at the same time. This Court may order debtor and lender to execute an agreement that would require lender, in the

event of foreclosure, to sell debtor's land subject to the five year prohibition against milk production. The creditor, of course, cannot be required to give up this portion of its bundle of rights without compensation.

How is fair compensation to be determined for this forced sale of a covenant running with the land for five years? The relative value of each piece of property for dairy and non-dairy use must, of course, be determined on a case by case basis, taking into account the character of the property and current land prices in the community. The difference in the two values is what the lender stands to lose if it is forced to sell the land subject to the five year restriction. For example, records kept for the past ten years by state farm management specialists for the University of Missouri show the average annual rate of return on farm real estate used in dairy production to be 5.25%, the average return on beef/crop land is 3.73%. Using those average figures a beef-crop operation would have a capital return only 71% of that of a dairy operation. These simple calculations, of course, do not take into consideration other circumstances such as lifestyle preference and market fluctuations that may effect the price of a particular farm. The Court will consider any information the parties provide on the valuation issue. Once the amount of compensation has been determined, the debtor will be required to set aside or assign a portion of his dairy termination funds or use them to purchase a bond to adequately protect the lender in the event of foreclosure.

It is important also to note that the dollar amount that is determined to be fair value for the restriction on the sale of land is not constant. If the lender forecloses in the first year of the dairy termination program, close to the full amount would be due because the land would be sold subject to a restriction lasting for close to five years. But if the debtor did not default until the fourth year of the dairy termination program, the land would be subject to only a short period of restriction. Adequate protection should, therefore, be structured in such a way that the debtor does not have to pay for any more than what the creditor's interest is diminished, which in the case of a debtor who avoids foreclosure for the five years of the dairy termination program, is nothing at all. Upon completion of the dairy termination program, the debtor may claim the set aside fund as his own. Likewise, if the lender forecloses later in the program, the debtor would be entitled to the unused portion of the fund. Of course, this will not be the case if the debtor elected to shift the risk by providing a bond.

Until such time as the parties present appropriate evidence as to dairy/non-dairy land values, debtor shall be required to set aside $8,500.00 of its dairy termination fund to adequately protect Boatmen's interest in debtors' real estate.

## TAXES

Debtor must also comply with Section 1129(a). In particular, post-petition taxes would come under the provision of Section 1129(a)(9)(A), which states that certain cash payments to holders of priority administrative expense claims are due "on the effective date of the plan". The IRS estimate of the amount of taxes due on the entire dairy termination fund should be either set aside completely at this time, or provided for in part by set-aside and in part by assignment of future payments, at debtors' discretion. Although the IRS was not present, testimony was heard that the estimated tax liability on the debtors' dairy termination fund ranges from "approximately $20,000.00 to up to 40% of the total fund ($41,854.00)". Because the IRS may offset tax liability against debtors' four future payments of $20,927.00, debtors will only be required to set aside a minimum of $21,000.00 for tax payments at this time. If debtors choose to set aside only the minimum amount and rely on future payments to cover an unmet tax liability, this Court will prohibit debtors from making any assignment of future payments until such time as the tax liabili-

ty is demonstrated to be less than $41,-854.00.

The remainder of the fund, after payment of $14,801.28 to the cattle lienholder, and set asides of $1,350.00 for the equipment lienholder, $8,500.00 for the real estate lienholder, and $21,000.00 for the Internal Revenue Service, is payable to debtor. Upon proof that lesser amounts are required to protect creditors' claims on equipment and land, or that debtors' tax liability has been overstated, debtors may seek additional payments from the set aside fund.

Of course, since the Court has ruled that the funds payable under the Dairy Termination Program are property of the estate, any expenditure in excess of the monthly budget previously approved must be approved by the Court before the debtors withdraw or expend them.

This Opinion shall constitute Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052.