[No. 53286–9.  En Banc.  July 15, 1988.]

RAINIER NATIONAL BANK, *Appellant,* v. WILLIAM F. BACHMANN, JR., ET AL, *Respondents.*

*Graham & Dunn* and *Philip H. Brandt* (*John L. Bley,* of counsel), for appellant.

*Karl D. Haugh,* for respondents.

BRACHTENBACH, J.—This case concerns the claim of a secured creditor to payments from the government to the debtor, pursuant to the federal Dairy Termination Program, described hereafter.

The secured creditor, Rainier National Bank (Bank) alleges a principal debt in default in the amount of $881,616.48. Bank claims security in the form of a real estate mortgage, a deed of trust, and perfected security agreements on collateral described hereafter.

Bank moved for summary judgment to determine that the Dairy Termination Program (DTP) payments are subject to its personal property security interests. The trial court denied Bank's motion, holding specifically that Bank does not have a security interest in DTP payments, that the holding was a final judgment as to that claim and continued other aspects of Bank's motion. Thus, we are concerned only with Bank's claimed security interest in DTP payments. We reverse.

Debtors executed three security agreements in favor of Bank. The first described as collateral "[a]ll Accounts (rights to payment for goods sold or leased or for services rendered) of Borrower now existing or hereafter at any time acquired" and "[a]ll proceeds of the foregoing". Clerk's Papers, at 29.

The second security agreement described as collateral

. . .

(b) All livestock . . . including but not limited to:
   336 Holstein Cows
    52 Holstein Heifers 1 day—2½ months
     4 Holstein Bulls 1 day—6 months
together with the young and produce thereof and all other livestock . . . now owned or hereafter at any time acquired by Borrower or in which Borrower obtains rights;

. . .

(f) All proceeds and products of all the foregoing.

Clerk's Papers, at 31. The security agreement also described as collateral farm and dairy equipment, crops, feed, seed, fertilizer and other supplies. The third security agreement covered beef cattle and proceeds. Clerk's Papers, at 36. The real estate mortgage and deed of trust covered the debtors' entire dairy farm.

The DTP was created as part of the Food Security Act of 1985, Pub. L. No. 99–198, § 101, 99 Stat. 1354, 1362 (codified at 7 U.S.C. § 1446(d)(3)(A)(i)). Implementing regulations are 7 C.F.R. §§ 1430.450 *et seq.* (1987).

The DTP requires a milk producer such as debtors to submit a bid to the Commodity Credit Corporation. This bid, when accepted, is the basis for payments to the producer. The producer's milk contract base is multiplied by an amount per hundredweight which results in the amount of the DTP payments.

The producer must sell for slaughter or for export all his dairy cattle; debtors elected to sell by auction for slaughter. The milk producer agrees that for a period of 5 years he will not acquire any interest in dairy cattle or in the production of milk or make available the milk production facilities that are otherwise available because of his compliance with the program. Failure of the producer to comply with the program requires repayment. 7 C.F.R. § 1430.462 (1987).

The government DTP payments to debtors here will total $672,914.21 with $538,330.21 paid the first year and

$33,646 in the second through fifth years. This dispute is about the government DTP payments totaling $672,914.21. Debtors refuse to assign those payments to Bank; instead they have attempted to assign them to other creditors, contending that Bank's interest is limited to the cash resulting from the sale for slaughter at auction. Apparently at the time of the trial court hearing the auction sale resulted in some $50,000 which was applied to the debt. Debtors have filed a Chapter 12 bankruptcy proceeding, 11 U.S.C. §§ 1201 *et seq.,* but Bank was granted relief from stay to pursue this appeal by stipulation and order in the bankruptcy court.

This is a case of first impression in Washington. Both parties cite decisions, most of which are bankruptcy court decisions, to support their respective positions. None of those decisions is binding upon this court and are of assistance only so far as they lend analysis which is persuasive to us. Care must be exercised in relying upon the cited decisions because of the differing nature of the government program involved and the type of security granted. The wide array of issues arising in the context of federal farm commodities payments are illustrated in the literature, *see, e.g.,* Rasor & Wadley, *The Secured Farm Creditor's Interest in Federal Price Supports: Policies and Priorities,* 73 Ky. L.J. 595 (1985).

We begin with the type of collateral in which Bank had a security interest. The security agreements covered "all accounts" and "all livestock" together with all "proceeds." Bank focuses solely on its security interest in the dairy cattle and their proceeds; therefore, we do not reach the issue whether the DTP payments fall within the security agreement on "accounts" other than as it is reflected in the definition of "proceeds." The debtors argue that the DTP payments are general intangibles and thus cannot be proceeds.

The key definition is provided by RCW 62A.9-306(1):

"Proceeds" includes *whatever is received* upon the *sale,* exchange, collection *or other disposition of collateral* or proceeds. . . . Money, checks, deposit accounts, and the like are "cash proceeds". All other proceeds are "non-cash proceeds".

(Italics ours.)

■ In our analysis we adopt the proposition that the expansive statutory definition of "proceeds" indicates that it is to be given "a flexible and broad content." *In re Munger,* 495 F.2d 511, 513 (9th Cir. 1974).

Next, our analysis must be made in the factual context presented. *In re Cupp,* 38 Bankr. 953 (Bankr. N.D. Ohio 1984). It is apparent from the record that the parties were involved in a lending–borrowing relationship relating to a complete dairy operation. The extensive nature of Bank's security interests indicates a comprehensive scheme of security involving the total operating dairy farm. The granting of a security interest in a dairy herd, together with the product and proceeds thereof, obviously contemplates security in more than the individual cows. The herd represents a continuing source of production resulting in a repetitive income flow. This security is quite different from a security in a single crop to be harvested and sold, or cattle which are raised only for slaughter for meat.

■ It was this type of collateral which debtors have destroyed and removed from Bank's security interest except for the nominal auction slaughter value of the cattle—a value which reflects their slaughter value rather than the value of a producing dairy herd with an established milk contract base. The question then is whether the DTP payments are "proceeds" of that dairy herd, the income–producing unit covered by the security agreement.

It appears plain that the statutory definition of "proceeds", which is binding upon the parties to the agreement, is so all–encompassing that the DTP payments are included. "'Proceeds' includes *whatever is* received upon the sale . . . *or other disposition* of collateral". (Italics ours.) RCW 62A.9–306(1).

It is apparent that disposition under the DTP is within the phrase "or other disposition." The parties did not contract for security in the proceeds only upon a sale with the resulting sale price being applied to the debt. Had that been their intention, the agreement would have been limited to proceeds received upon sale. The phrase "or other disposition" necessarily anticipates the herd being disposed of in some manner other than by sale.

The statute also evidences an intent to include more than the usual cash proceeds received in a normal sale of the collateral. It provides that proceeds include "*whatever*" is received. The dictionary definition of "whatever" confirms the common understanding of the meaning of the word "whatever": "anything . . . everything . . . no matter what . . . anything at all". *Webster's Third New International Dictionary* 2600 (1976).

The debtors will receive from DTP more than the equivalent of cash value of the dairy herd but that is not determinative. The sale of the herd for slaughter is a disposition within the statute. The contract payments are within the common meaning and understanding of the word "whatever" is received upon disposition.

The method of calculating the DTP contract price indicates that it was compensation for more than the slaughter value of the cows. Rather the price reflected the value of a producing dairy herd which is what the security interest covered. The price was calculated on the milk contract base times an amount per hundredweight. This reflects consideration of the herd and its production, rather than a per cow market value.

In reviewing the relatively few cases relevant to this issue, it is necessary to consider the language of the security agreement and the type of commodity program involved. The results of the cases are in conflict; some are conclusory, some analytical. We disagree with some.

One of the early cases is *In re Munger,* 495 F.2d 511 (9th Cir. 1974). The case involved subsidy payments made in return for abandonment of a sugar beet crop. The opinion

provides a rationale which is persuasive. First, the court adopted a flexible and broad content approach to the definition of proceeds. Second, the court assumed that the security agreement was drafted "with an awareness of the importance of the various forms of federal subsidy payments to the realities of financing a farming operation based upon sugar beets". *In re Munger,* at 513. Further,

> Abandonment payments, like the subsidy payments based on sugar content, are an integral part of the sugar-beet farming business and, when received, are within a broad reading of "proceeds." Not to include such payments within the term "proceeds" would be to raise distinctions of form over the realities underlying this financing transaction, a result contrary to the intent of the Uniform Commercial Code. *See* Uniform Commercial Code § 9–110; C.C.C. § 9110; Biggins v. Southwest Bank, 490 F.2d [1304,] 1308 [(9th Cir. 1973)].

*In re Munger,* at 513.

A number of cases involve claimed security interests in commodities affected by the Payment–In–Kind (PIK) program. 7 C.F.R. § 770.1(a) (1984). Broadly stated, the intent of the PIK program was acreage reduction and land diversion. In return for reduction or diversion the farmer received a quantity of the commodity as a substitute for the crop turned under or never planted. Marsh, *Are PIK Payments "Proceeds" Under Article 9?,* 7 J. Agric. Tax'n & L. 291, 297 (1986).

Several cases are illustrative of the rationale employed in holding that payments under the PIK program are proceeds subject to a security interest on the crops destroyed or never planted. The debtor in *In re Cupp, supra,* gave a security interest in crops and proceeds. The court held the PIK entitlements were within the security agreement. The court held:

> When determining the intent of the parties, the Court must consider the contract in the context of its apparent purpose, the circumstance surrounding its execution, and the equities of the contended matter. . . .

The PIK program was initiated to promote certain federal policies. In pursuit of those policies, the program was designed to compensate farmers for not producing crops which they otherwise would have raised. In that respect, the participants are receiving the products of their business without having to actually perform the work. Since the term "proceeds" is intended to apply to that which is produced from a creditor's collateral which, in the absence of the PIK program, would have been grown, it must also apply to that which is produced as though it had been grown. . . .

*In re Cupp,* at 955.

A review of the agreement finds that it did not address the question of whether or not government subsidies would be considered as collateral. However, it is also apparent that the contract was a comprehensive agreement which appears to convey a security interest in all revenues that were produced from the Debtor–In–Possession's land. In view of the all–inclusive character of the agreement, it must be concluded that the contract expresses the intent that the Plaintiff was to acquire a security interest in whatever recompense the Debtor–In–Possession received as a farmer, regardless of whether it was for having raised crops or for participating in a government subsidy program. . . .

*In re Cupp,* at 956. Finally, the court articulated logical and cogent policy reasons for its decisions.

The comprehensive language of the agreement must be read in the context of that awareness, despite the fact that the specific program in which the Debtor–In–Possession participated was not in existence at the time the agreement was executed. It should also be noted that if this Court were to hold that PIK proceeds are not "proceeds", an artificial distinction would be created between proceeds from the sale of crops actually grown and the proceeds received as though they had been grown. It would also create an unconscionable means by which a farmer could defeat a creditor's security. If PIK payments were not proceeds, a farmer could abandon all farming activities in favor of program participation, thereby allowing him to dissipate the proceeds of the programs without any regard for their creditor's interests. Such a result cannot be permitted.

*In re Cupp,* at 956. The *Cupp* decision cited a number of supporting authorities not repeated here.

A similar result was reached in *In re Judkins,* 41 Bankr. 369 (Bankr. M.D. Tenn. 1984) where the security interest was in crops and proceeds. The court reasoned that "proceeds" constitute whatever is substituted for the original collateral, *Judkins,* at 372. It said

> The PIK payments are traceable to the crops subject to the defendants' security interests. The PIK entitlements are for specific crops, on specific acreage, and for specific production. Such a nexus between the entitlements and the original collateral indicates that participation in the PIK program was a substitute for the planting of the crop collateral.

(Footnotes omitted.) *In re Judkins,* at 373. Further,

> A flexible interpretation of the concept of "proceeds" promotes responsible management of farming operations by allowing alternatives to growing crops while simultaneously protecting creditors' security interests.

*In re Judkins,* at 373. The court rejected the bankruptcy trustee's argument that the change in form from "crops" to "contract rights" precluded the security interest. The court noted at page 373 n.4, that proceeds will almost always be in a form different from the original collateral. *Accord, In re Lee,* 35 Bankr. 663 (Bankr. N.D. Ohio 1983) and see cases cited in *In re Cupp, supra.*

The case of *In re Kruse,* 35 Bankr. 958 (Bankr. D. Kan. 1983) is cited as authority for a contrary holding on PIK payments. The court denied a security interest as to crops never planted. More importantly the debtor entered the PIK program *after* filing bankruptcy so the Bankruptcy Code prevented a claim to post–bankruptcy property. The court recognized the security interest in PIK payments as proceeds for crops planted before bankruptcy filing. *Kruse* is criticized, *see* 73 Ky. L.J. 595, 657 (1985).

Debtors rely on several cases to support their position. We either distinguish or reject their authorities. *In re Schmaling,* 783 F.2d 680 (7th Cir. 1986) denied security in

PIK payments where the security agreement described crops and proceeds. The court held that a security interest must be *strictly* limited to the collateral described. It relied on a state case defining crops as products of the earth. Because there was no crop of which to dispose there was no collateral within the agreement. Those facts are quite different from the destruction of the very described collateral as in this case.

Debtors rely heavily upon *Grunzke v. Security State Bank,* 68 Bankr. 446 (Bankr. D. Minn. 1987) which denied a security interest in DTP payments. The court cited no authority for its conclusion. It reasoned, erroneously we believe, that the DTP payments had nothing to do with the dairy cattle, but were payments to the farmer for future income lost by going out of the dairy business for 5 years. The court said the payments were particular to the business production and efforts of the individual. Of course it is the production of the herd that is relevant. The farmer's particular talents may be utilized in the dairy business in any capacity except for acquiring an *ownership* interest in dairy cattle or facilities. 7 C.F.R. § 1430.457(b) (1987). Also distinguishing *Grunzke* is the fact that the DTP was entered into *after* filing a petition for bankruptcy, *see* 11 U.S.C. § 552(a).

*In re Weyland,* 63 Bankr. 854 (Bankr. E.D. Wis. 1986) is cited for the same result. That court said it was bound by the *Schmaling* rationale strictly limiting the security interest to specifically described collateral. It characterized the DTP payments as general intangibles, not described in the security agreement, and, therefore, not covered. We disagree with this analysis.

*In re Collins,* 68 Bankr. 242 (Bankr. D. Minn. 1986) likewise considered DTP payments as not covered intangibles.

The fault with the general intangibles analysis is that "proceeds" and "general intangibles" are not mutually exclusive. In *Osteroos v. Norwest Bank Minot, N.A.,* 604 F. Supp. 848, 849 (D.N.D. 1984), the court specifically recognized that PIK payments could be covered by "proceeds"

even though the security agreement did not cover "general intangibles."

In sum, we agree with the conclusion of the author of a leading text:

> [I]n short, many courts appear to be buying the argument that, while PIK payments constitute general intangibles as a category of collateral, they also constitute proceeds of crops so that failure to mention general intangibles in a security agreement or financing statement is not fatal. As a policy matter, the court in *Judkins* [41 Bankr. 369 (Bankr. M.D. Tenn. 1984)] makes the solid argument that a liberal construction of "proceeds" is necessary to avoid interference with the federal agricultural subsidy programs.

B. Clark, *Secured Transactions Under the Uniform Commercial Code* ¶ 8.5[1][a], at 38–39 (Cum. Supp. No. 1, 1987).

The DTP payments are a substitute for the income producing dairy herd. They are within the statutory definition of "proceeds" representing "whatever" is received upon "disposition" of the cattle.

The trial court is reversed.

PEARSON, C.J., and ANDERSEN, CALLOW, and DURHAM, JJ., concur.

DORE, J. (dissenting)—The majority holds that Rainier National Bank's security interest in the "proceeds" of a dairy herd metamorphosed into a security interest in payments received by a dairy farmer from the federal Dairy Termination Program (DTP). The majority's holding is inconsistent with the plain language of RCW 62A.9–306(1), the purpose of the DTP, and results in an unjustified windfall for the Bank. I dissent.

### DAIRY TERMINATION PROGRAM PAYMENTS

An understanding of the nature of the DTP is necessary to determine whether the DTP payments fall within the definition of proceeds. The purpose of the DTP is to reduce the quantity of milk marketed for commercial use, thereby

helping to stabilize milk prices. *See Grunzke v. Security State Bank,* 68 Bankr. 446, 447 (Bankr. D. Minn. 1987); *In re Weyland,* 63 Bankr. 854, 857 (Bankr. E.D. Wis. 1986). Under the program, dairy operators enter into a contract with the Commodity Credit Corporation (CCC). A participating dairy operator: (1) must slaughter or export his or her entire herd of dairy cattle, and (2) is prohibited from acquiring any interest in any other dairy cattle or a proprietary interest in any milk production facility for a 5–year period. 7 C.F.R. § 1430.460 and .462 (1988). Should the dairy operator default under the contract, all payments must be returned together with interest. 7 C.F.R. § 1430-.462(a). The dairy operator also faces the potential of substantial penalties. 7 C.F.R. § 1430.460.

The dairy operator's application or "bid" under the program is based on a dollar per hundredweight of milk produced during certain designated periods. The resulting figure determines the total payments to be received for the dairy operator's agreement to sell his or her dairy cattle and stay out of the dairy business for the 5–year period. 7 C.F.R. § 1430.455. The CCC accepted the Bachmanns' bid of $672,914. Under the terms of their contract, the Bachmanns were required to slaughter or export their dairy herd by August 31, 1986.

Initially, I take issue with the implication in the majority that the Bank has been prejudiced by the sale of the dairy herd for "nominal" slaughter value. The majority ignores the fact that the Bank sought and received a temporary restraining order preventing the Bachmanns from slaughtering their herd. The order was dissolved on August 20, 1986, 11 days before the Bachmanns were required to slaughter their herd under the terms of their contract with the CCC. As a direct consequence of the Bank's actions, the Bachmanns were forced to sell their herd at a distressed price. During the period the temporary restraining order was in effect, the Bachmanns turned down several offers to purchase their herd at a price substantially higher than the slaughter price. The Bachmanns' interests were prejudiced

in that the Bank's actions reduced the amount the Bachmanns could offset against their debt. The Bank caused the farmer's prejudice.

The Bank was not granted an interest in the Bachmanns' DTP payments for they were not mentioned in the security agreement. The majority, citing *In re Munger*, 495 F.2d 511 (9th Cir. 1974), suggests that the parties nonetheless intended to include the DTP payments in the security agreement because federal entitlement programs are an integral part of modern farming operations. The majority and the court in *Munger* fail to explain why the parties did not include any description of federal entitlement programs in the security agreement if they intended to include such payment as security.

In construing a security agreement, the court's duty is to determine the parties' intentions at the time of contracting. *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 340, 738 P.2d 251 (1987); 79 C.J.S. *Secured Transactions* § 49 (Supp. 1974). There is no evidence in this record to even suggest that the parties intended the DTP payments to be collateral subject to the Bank's security interest. In the absence of such evidence, it is unreasonable to hold, as the majority does, that the parties intended to include the DTP payments as collateral.

Due to the Bank's failure to properly draft its security agreement, this court is forced to characterize the DTP payments under the Uniform Commercial Code (U.C.C.). The majority holds that the DTP payments can be classified as proceeds. Proceeds are defined by RCW 62A.9–306(1) as:

> whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.

The majority reasons that the DTP is encompassed within the phrase "or other disposition" of the collateral and that the DTP payments are within the common meaning of the word "whatever" is received upon disposition. Majority, at 302–03. Several considerations lead to the inescapable

conclusion that the majority's expansive view of proceeds is not warranted by the language of RCW 62A.9–306(1) or the facts.

First, the majority's "all–encompassing" interpretation of proceeds does violence to the plain language of RCW 62A.9–306(1). The phrase "other disposition" is not defined in the U.C.C. The majority, apparently content with the bare legal conclusion that the DTP is a "disposition" of the collateral, also fails to define the phrase. The phrase is defined in *Weisbart & Co. v. First Nat'l Bank*, 568 F.2d 391, 395 (5th Cir. 1978) as follows:

> The meaning of [other disposition] may be distilled by applying the canon of statutory construction known as *ejusdem generis*. Employment of the doctrine mandates that "other disposition" refer to a transaction of the same general type as a sale or exchange. Therefore, though "other disposition" cannot technically be characterized as a sale or exchange, at the minimum it must meet the threshold test of these two transactions by effecting a transfer of property.

(Footnote omitted.) *Accord,* 9 R. Anderson, *Uniform Commercial Code* § 9–306:12 (3d ed. 1985). The phrase "other disposition" and the terms "sale" "exchange" and "collection" are legally synonymous; each refers to a transaction that results in the direct transfer of the collateral.

The majority's holding that the DTP is a "disposition" of the dairy herd mischaracterizes the nature of the program. The DTP is not itself a disposition of the Bank's collateral because the program does not directly transfer the dairy herd. The DTP is a contractual agreement whereby a dairy operator agrees to get out of the milk production business for 5 years. The phrase "other disposition" does not include contract rights between a debtor and a third party.

Here, the Bachmanns granted the Bank a security interest in their dairy herd and the proceeds of the herd. In other words, they pledged the value received from the sale, exchange or disposition of the dairy herd. The transaction that effected a transfer of the dairy herd—the "disposition"

of the collateral—was the sale of the herd for slaughter. The proceeds—"whatever" is received upon the disposition—was the slaughter price, money which the Bank received. Once the Bank received the slaughter price, it received its security. Simply put, the Bachmanns' agreement to get out of the dairy business creates no collateral and, therefore, no proceeds.

Second, the majority's willingness to distort the concept of proceeds to fit the facts of this case is unnecessary because the U.C.C. contains a general category of collateral that covers government entitlements. Under the U.C.C., a secured party can obtain an interest in "general intangibles" which is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." RCW 62A.9–106. This is a general "catch–all" category of collateral that includes contract rights. *See* 68 Am. Jur. 2d *Secured Transactions* § 176 (1973). I believe the phrase "general intangibles" fairly characterizes the right of a debtor to receive DTP payments under a contract with the federal government.

Third, in all the cases dealing with the DTP cited by the parties, the courts have refused to extend the concept of proceeds to include DTP payments. *Lisbon Bank & Trust Co. v. Commodity Credit Corp.,* 679 F. Supp. 903, 905 (N.D. Iowa 1987); *Bank of North Ark. v. Owens,* 76 Bankr. 672, 674 (Bankr. E.D. Ark. 1987); *Grunzke,* at 449; *Weyland,* at 859; *see also In re Collins,* 68 Bankr. 242, 243–44 (Bankr. D. Minn. 1986) (holding that DTP payments are "general intangibles" but not reaching the issue of whether payments are proceeds). These courts correctly reason that DTP payments are the consideration for the dairy operator's promise to get out of the dairy business for 5 years. The payments are calculated and based on factors peculiar to the dairy operator's business skill and are not directly related to the cows themselves. Decisions dealing with the Milk Diversion Program, the program that preceded the DTP, are in accord. *See In re Bechtold,* 54 Bankr. 318, 320

(Bankr. D. Minn. 1985); *In re Frasch,* 53 Bankr. 89, 90 (Bankr. D.S.D. 1985).

Fourth, the majority's holding is inconsistent with the commercial realities in this case. The Bachmanns could have disposed of their herd in a commercially reasonable manner and gotten out of the dairy business at any time. If the Bachmanns had simply quit the dairy business, the Bank could not have claimed that its rights under the security agreement were prejudiced because the Bachmanns were no longer producing milk. Thus, when the security agreement was executed, the Bank knew that its security interest was limited to the value of the Bachmanns' herd at the time of disposition.

Fifth, the majority's reliance on *In re Cupp,* 38 Bankr. 953 (Bankr. N.D. Ohio 1984), which involved the Payment–In–Kind program (PIK), is of no help. The cases are in general agreement that PIK payments made to a farmer where the farmer agrees to abandon a planted crop, disaster payments made to supplement a planted crop and subsidy payments to supplement a planted crop are proceeds of the crop under the U.C.C. *See, e.g., Munger,* at 512–13 (sugar beet subsidy); *In re Kruse,* 35 Bankr. 958, 965 (Bankr. D. Kan. 1983) (PIK payments are proceeds of *planted* crops). In these cases, the agricultural entitlements are properly characterized as proceeds because the payments are substitutes or replacements for crops that actually existed. The courts, however, have been inconsistent in their classification of PIK payments where the farmer receives PIK crops in exchange for an agreement to refrain from growing crops. *See generally* Marsh, *Are PIK Payments "Proceeds" Under Article 9?,* 7 J. Agric. Tax'n & L. 291, 299–312 (1986); Comment, *Bankruptcy, the U.C.C., and the Farmer: PIK Payments—Heads "General Intangibles," Tails "Proceeds" [In re Schmaling 783 F.2d 680 (7th Cir. 1986)],* 26 Washburn L.J. 178 (1986). The prevailing view is that PIK payments granted to the farmer for the farmer's agreement to forgo planting a crop do not constitute proceeds, but are contract rights or general intangibles. *See, e.g., In re*

*Schmaling,* 783 F.2d 680, 682–83 (7th Cir. 1986); *In re Sunberg,* 729 F.2d 561, 562 (8th Cir. 1984); *In re George,* 85 Bankr. 133, 145 (Bankr. D. Kan. 1988); *Kruse,* at 966. The courts adopting this position reason that the consideration for the farmer's agreement not to plant future crops could only be a general intangible in the form of the right to receive PIK payments. *See Kruse,* at 966. In my view, these are the better–reasoned cases.

Moreover, the DTP program is distinguishable from the PIK program. Under the PIK program, the farmer continues in the farming business, but agrees to take crop land out of production for one growing season. In contrast, the DTP eliminates the dairy farmer from production for a 5–year period. The DTP payments are the only consideration for the dairy operator's agreement to get out of the dairy business and are not substitutes or replacements for the Bank's collateral.

Finally, I look to the intent of Congress in enacting the DTP. Although the DTP requires the participating dairy operator to stay out of the dairy business for a 5–year period, the intent of the program is to permanently eliminate the operator from the dairy business. The DTP payments serve two purposes: (1) they induce the farmer to get out and stay out of the dairy business, and (2) they give the operator the resources to transition to a new business or profession. The Bachmanns would be required to return all payments made under the DTP if they were to breach their agreement and get back into the dairy business. The Bank, however, would not be required to return the DTP payments should the Bachmanns breach. Once the DTP payments are in the hands of the Bank, the Bachmanns are denied the resources to seek new employment. The majority's holding, therefore, defeats the DTP's goal of reducing dairy herds. Obviously Congress did not intend this, for if the Bank takes all the program funds supplied by the government, the farmer will have little, if any, incentive to stay out of the dairy business for 5 years.

The Bank could have easily avoided potential losses by careful drafting. If the Bank had intended to include DTP payments as collateral it could have included in its security agreement a reference to "government entitlements", "general intangibles" or "contract rights". Since the Bank's security agreement did not contain such language, the Bank cannot claim that the DTP payments are part of its collateral.

### CONCLUSION

The DTP payments were not received upon the "sale, exchange, collection or other disposition" of the Bank's collateral and therefore the payments cannot be classified as "proceeds" under RCW 62A.9–306(1). The Bank, therefore, did not have a security interest in the Bachmanns' DTP payments.

I would affirm the trial court.

UTTER, DOLLIVER, and GOODLOE, JJ., concur with DORE, J.

Reconsideration denied September 28, 1988.