**In re HOFSTEE, Hans and Bonnie, Debtors.**

**Bankruptcy No. 83–01846–114.**

United States Bankruptcy Court, E.D. Washington.

Aug. 3, 1988.

Bruce R. Boyden, Spokane, Wash., for debtor.

Patricia L. Murphy, Spokane, Wash., for Small Business Admin.

Neil E. Humphries, Spokane, Wash., for landlords, Anderson.

Jeffrey D. Stier, Olympia, Wash., for creditors' committee.

## MEMORANDUM DECISION

JOHN M. KLOBUCHER, Bankruptcy Judge.

### BACKGROUND

During the course of administration of this Chapter 11 estate, the debtors-in-possession entered into a contract to participate in the Dairy Termination Program with the United States Department of Agriculture. Under this program, the debtors agreed to sell their dairy herd for slaughter and not to have any interest in dairy cattle or in the production of milk for a period of five years. The program also required both the landlord, who was leasing the facilities to the debtors, and the debtors to agree that the production facilities would not be used for the production of milk during the five year period. In return for the above, the debtors received $195,972.16 in cash plus an additional $48,-993.04 to be paid over the term of the contract.

The debtors are indebted to the Small Business Administration ("SBA") in the approximate amount of $307,000. This debt is secured by an interest in the cattle, contract rights, proceeds and profits of the same and general intangibles.

The debtors have proposed a plan of reorganization through which the debtors would pay the SBA the slaughter price of the cattle (approximately $24,000), relinquish certain items of real and personal property in which the SBA has a specific security interest, pay other secured and priority debts, and retain the balance of the funds for their personal use. Unsecured creditors would receive nothing. This proposal is based on the debtors' assertion that the SBA security interest extends only to the slaughter proceeds of the cattle, and on the further assertion that the remaining funds of the Dairy Termination Program are not property of the estate under 11 U.S.C. section 541. The SBA and the unsecured creditors committee object to confirmation of the proposed plan.

## ISSUES

Two issues must be resolved before the confirmation may proceed. First, what is the nature and extent of the SBA lien? Second, are the proceeds of the Dairy Termination Program property of the estate?

## THE SBA LIEN

The SBA asserts that it holds a security interest in the entire payments of the Dairy Termination Program. In support of its position, the SBA cites numerous rulings under the previous PIK Plan and Dairy Diversion Program. The SBA also cites *In re Bowling*, 64 B.R. 710 (Bankr.W.D.Mo. 1986). As an alternative theory, the SBA asserts that the payments under the Dairy Termination Program constitute a general intangible and as such are covered by the parties' security agreement.

As to the SBA's interest in the dairy herd, this Court adopts the reasoning of *In re Bowling:*

> Because the program is new, there are no cases or precedents under this legislation. The Court believes, however, that rulings under the previous PIK Plan and Dairy Diversion Program offer some guidance. See, e.g., *In re Sunberg*, 729 F.2d 561 (8th Cir.1984); *In re Hollie*, 42 B.R. 111 (Bankr. MD GA. 1984). There the better reasoned cases seemed to establish that the secured lender's lien extended to the PIK commodities or PIK and Dairy Diversion payments received by the farmer. To the Court, that analogy is appropriate here. Further the Court believes that it is the debtor who makes the choice to participate in the program, not the secured lender, and the loss from $600.00 per animal to less than $300.00 per animal is strictly because of the debtors' decision. To have the debtor carry out such a decision, one of the essential elements to receiving $104,-634.00, and then afford the creditor only the slaughter price is neither fair nor equitable. Therefore, at least as to the fair market value of the dairy herd, as a

dairy herd, the perfected secured creditor must be compensated.

*Id.* at 713.

I, therefore, hold that in this case the SBA is entitled to receive on account of its lien the market value rather than the slaughter value of the dairy herd.

It is important to recognize, however, that the debtors acquired no interest in the program payments until after the bankruptcy petition was filed. The postpetition effect of the SBA's security interest is determined by section 552(a) of the Bankruptcy Code which provides: "(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. section 552(a). When the security interest extends "to proceeds, product, offspring, rents, or profits" of prepetition secured collateral, then the proceeds continue to be subject to the security interest. 11 U.S.C. section 552(b). Since the debtors acquired their interest in the payments after the commencement of the case, the SBA must demonstrate that such payments are proceeds of its prepetition secured collateral in order to subject the payments under the Dairy Termination Program to its lien. *Dettman v. Fresno–Madera Production Credit Association*, 84 B.R. 662 (9th Cir. BAP 1988).

Whether the payments are proceeds of the SBA collateral requires an analysis of the agreement between the debtors and the Department of Agriculture. As noted above, this agreement required that the production facilities would not be used for the production of milk for a period of five years. Moreover, the debtors could not personally acquire any interest in the production of milk during this time.

This transaction under the Dairy Termination Program is similar to the sale of a going concern business coupled with a covenant not to compete. Although the transaction is unusual in that the Department of Agriculture did not purchase the physical assets and did not intend to continue opera-

tion of the business, I do not believe the motives of the contracting parties to be the determining factor. In all other respects, the transaction resembles the sale of a business as a going concern. Such transactions customarily include compensation for the goodwill of the business, and often include additional compensation for a covenant not to compete. I find this transaction, at least from the debtors' viewpoint, to contain an element of each.

Goodwill is clearly a general intangible as recognized by the official comments to the Uniform Commercial Code section 9–106. Wash.Rev.Code section 62A.9–106 (1987). The goodwill of the debtors' dairy business existed prior to the bankruptcy filing. With a security interest in general intangibles, the SBA had a perfected security interest in the goodwill prior to the filing of the bankruptcy petition, and its lien will be recognized on any proceeds attributable to goodwill. The covenant not to compete arose during administration of the estate. Any proceeds derived therefrom are not subject to the SBA lien by virtue of 11 U.S.C. section 552(a).

### PROPERTY OF THE ESTATE

The final issue is whether unencumbered proceeds from the noncompetition agreement are property of the estate under 11 U.S.C. section 541 which provides as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

(A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

.    .    .    .    .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

The SBA and the unsecured creditors urge that *In re Bowling*, 64 B.R. 710 (Bankr.W. D.Mo.1986) is dispositive of that issue. In *Bowling*, the court stated:

Debtors' counsel, sans citation or development, makes the argument that the funds come from a contract that is a covenant not to compete and that the contract involves the personal services of the debtor. Were such a contention sound, the Court would be faced with a far different problem. Debtor is not required to abstain from working in any dairy operation and he can go to work tomorrow in any phase of dairying as long as he has no ownership interest. Furthermore, the obtaining of the funds also rests upon the slaughter of the herd (which is clearly property of the estate) and not using the real estate or dairy barn (again clearly property of the estate). It is not the personal services of the debtor (or its obverse) that is restrained, merely the ownership interest. *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515, tells us that Section 541(a) is to be given a broad reading in determining property of the estate. See also *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984).

*Id.* at 712.

Contrary to *Bowling*, debtors' counsel in the instant case has supported his argument with citations and development which this Court finds persuasive.

This Court adopts the reasoning of *In re Hammond,* 35 B.R. 219 (Bankr.W.D. Okla.1983), and concludes that proceeds received for postpetition performance of a noncompetition covenant are not property of the estate and may be retained by the debtor.

The contract executed by the debtors in this case provides: "During the five year nonproduction period as calculated pursuant to paragraph 8 of this Appendix, no participating producer or related person may have, retain, or acquire any interest in dairy cattle or in the production of milk." The contract requires the producer to file a certificate of compliance within 30 days of each anniversary during the life of the contract. It contains severe penalties for noncompliance, including the repayment of any funds previously received. Should the producer even involuntarily acquire an interest in dairy cattle or a dairy facility during the life of the contract, such as through inheritance, the value of the acquisition is deducted from the contract payment.

The *Bowling* Court concluded that 11 U.S.C. section 541(a)(6) and (7) are controlling in holding that the entire payment is property of the estate. The Court reasoned that the entire contract payments fall within subsection (7) because they were received after commencement of the case. Any portion of the payments attributable to the covenant not to compete fails to qualify for the exception contained subsection (6) because it does not constitute payment for services of the debtor (or its obverse). While this analysis has appeal, this Court has chosen to adopt a different approach which leads to a different conclusion.

In my opinion payments received for the debtors' personal postpetition noncompetition agreement are not encompassed by subsection (7) or any other provision of 11 U.S.C. section 541. I interpret subsection (7) as directed toward assets which are acquired through the use of assets which are *existing* property of the estate. I believe this interpretation is supported by the language "property that the estate acquires." If Congress had intended that postpetition assets acquired through the resources of an individual debtor would become property of the estate under section 541 it would have employed the language "property that the debtor acquires" similar to the language employed in section 541(a)(1) and (2).

I recognize that the debtor is not restricted from employment in the dairy business. I do not, however, believe such restriction to be a required ingredient of noncompetition covenants. Somewhat to the contrary, such covenants in the private sector are deemed an unlawful restraint of trade if unreasonably restrictive.

Neither am I persuaded by the fact that some of the Dairy Termination Program payments, such as payment for the dairy herd, obviously constitute property of the estate. Rather, I suggest that payments may be partly property of the estate and partly not. Admittedly, this analysis would be more clear if the contract had specified the consideration of the debtors' covenant not to compete as an exact sum of money. Assessment of the value of this covenant may now be difficult, but difficulty of assessment should not change the character of its composition.

I have not attempted to analyze the character of the covenant not to use the leased premises for dairy purposes. The evidence before the court is insufficient to permit such determination. Confirmation of the debtors' proposed plan of reorganization will be denied.

### ADDENDUM

Subsequent to the Court's circulation of the above opinion, the Supreme Court of the State of Washington rendered its opinion in *Rainier National Bank v. Bachmann,* 111 Wash.2d 298, 757 P.2d 979 (1988). The majority of that Court held that Dairy Termination Program payments are "proceeds" of the dairy herd.

I interpret the opinion to imply that all Dairy Termination Program payments fall within the definition of "proceeds". There is no specific federal law restricting or

governing the perfection of security interests in Dairy Termination Program payments. This Court must therefore look to state law for that determination. This requires some adjustments in my previous opinion.

■ I note two important distinctions between *Rainier National Bank v. Bachmann* and the case at bar. First, *Rainier* involved a two-party Dairy Termination contract between the Department of Agriculture and the Bachmanns. The case at bar involves a three-party contract among the SBA, the debtors, and the debtors' landlord. The security interest of the SBA in this case obviously cannot rise above the interest of the debtors. Some portion of the payments in this case have been attributed to the landlord as compensation for his agreement to not permit the use of his facilities for the production of milk for a five year period. That part of the payment stream is neither property of the estate nor subject to the SBA security interest.

Second, the Court in *Rainier* was admittedly not concerned with the application of bankruptcy law. Although this Court must now consider any portion of the payments attributable to the debtors' covenant not to compete to fall within the definition of "proceeds" of the dairy herd, this invites further consideration of 11 U.S.C. section 552. That section provides:

*Section 552. Postpetition effect of security interest*

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. section 552.

■ Generally, the phrase "except to the extent that the court, after notice and hearing and based on the equities of the case, orders otherwise" has been applied to situations when the estate has acquired proceeds at the expense of other creditors holding unsecured claims. A classic example in farm bankruptcies occurs when the secured creditor has a lien upon an existing crop at the time the petition is filed. The debtor-in-possession or trustee expends unsecured funds of the estate toward care and harvesting of the crop. Those funds, which would otherwise have been available for the benefit of unsecured creditors, have now served to enhance the value of the crop proceeds. Equity may dictate that the enhanced value be retained for the benefit of the estate, and section 552(b) allows the Court this latitude. This Court is unaware of any precedent which has applied this principle to a situation where the debtor has expended personal funds or effort which are not property of the estate toward the enhancement of a secured interest which would otherwise be available for the debtors' "fresh start". I find nothing, however, to prohibit its application to those circumstances.

The debtors should not be deprived of the opportunity to prove that the value of the SBA's collateral was measurably enhanced by the debtors' covenant not to compete and that the contract payments exceed the amount which might have been otherwise received through other disposition of the collateral. Such amount, if established, has obviously been at the expense of the debtors' right to a "fresh

**314**

start" under the equitable principles of bankruptcy law. Although the debtors are not prohibited from employment in the dairy industry, they have foregone their chosen vocation.

Under the equities of this case, and the discretion conferred upon me by 11 U.S.C. section 552(b), this Court will declare any such enhanced value to be severed from the SBA's security interest afforded by 11 U.S.C. section 552. Either party may request a hearing on the factual determinations required by this opinion.