In the Matter of: Owen
GRUNZKE, Debtor,

v.

SECURITY STATE BANK OF
WELLS, Appellant.

Bankruptcy No. 3–86–435.
No. Civ. 4–86–791.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 6, 1987.

Peter B. Stein, Stein & Moore, P.A., St. Paul, Minn., Howard F. Haugh, McLean Peterson Law Firm of counsel, Mankato, Minn., for appellant.

Arvid Wendland, Callaghan, Wendland & Hammond, Blue Earth, Minn., for respondent debtor.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on appellant's appeal from the August 22, 1986 amended order of the United States Bankruptcy Court. The bankruptcy court's amended order will be affirmed.

### FACTS

This is a chapter 7 bankruptcy appeal in the matter of Owen Grunzke, a dairy farmer in Faribault County, Minnesota. Appellant is the Security State Bank of Wells, a secured creditor of debtor Grunzke. Security State Bank of Wells is also located in Faribault County, Minnesota. Jurisdiction arises pursuant to 28 U.S.C. § 158(a), appeals from final orders of bankruptcy courts. Appellant appeals from the amended order of the bankruptcy court dated August 22, 1986, in which the bankruptcy court denied a portion of appellant's claim

to collateral, specifically, appellant's entitlement to Dairy Termination Program payments.

The chapter 7 bankruptcy petition was filed on February 20, 1986. According to the bankruptcy schedules, debtor apparently owns an approximately 160–acre farm, of which 120 acres are owned free and clear. Debtor's farm was a small grade B dairy operation in rural Wells, Faribault County, Minnesota. At the time of filing the petition on February 20, 1986, debtor Grunzke had already dispersed most of his personal property at a farm sale that had been urged by the bank. After application of the proceeds of this sale, debtor still owed the bank $106,000.

Approximately two weeks after the filing of the bankruptcy petition, on March 7, 1986, the debtor contracted with the Commodity Credit Corporation (CCC) of the United States Department of Agriculture to participate in the Dairy Termination Program of the United States Department of Agriculture, 7 U.S.C. § 1446. The Dairy Termination Program is a federal government program in which CCC, on behalf of the government, is authorized to enter into contracts with milk producers. The program's underlying purpose is to reduce the quantity of milk marketed for commercial use, thereby helping to stabilize milk prices. Essentially, the program works as follows: once a milk producer is accepted into the program, the milk producer must either slaughter or export his or her entire herd of dairy cattle by the end of the contract disposal period. In addition, the milk producer must not acquire any interest in any other dairy cattle or acquire a proprietary interest in any milk production facilities for a period of five years.

To enter the program, the milk producer is required to put together a bid, based upon a dollar per hundred weight of milk produced. This bid is then multiplied by the contract base. The contract base is the milk producer's total milk production during the lower of two designated one-year periods: July 1, 1984 through June 30, 1985, or January 1, 1985 through December 31, 1985. The resulting figure (bid x contract base) determines the total payment to be received by the milk producer in return for disposing of his or her dairy cattle and refraining from milk production for the five-year period.

The milk producer can select a number of options for payment. The option selected in the case at bar was for milk producer Grunzke to receive 80 percent of the entire payment in the first year following herd disposition, with the remaining 20 percent of the payments made in four annual equal installments thereafter.

At the time of his application to the program, debtor Grunzke had eleven dairy cows, seven heifers, and four calves. His base milk production for the period January 1, 1985 through December 31, 1985 was determined to be 98,395 pounds of milk. His bid price for getting out of the dairy business, which was ultimately accepted by the program, was $18.00 per hundred weight. In compliance with the program, debtor Grunzke sold his dairy herd for slaughter. The bank received the proceeds from the slaughter.

The total payment under the program then due to Grunzke was $17,711. Under the 80 percent option he selected, $14,169 was to be paid immediately, pending only the resolution of this controversy over who is entitled to this money, the debtor or the appellant bank.

Appellant Security State Bank of Wells is, according to the bankruptcy schedules, debtor Grunzke's major creditor. Grunzke's total indebtedness to the bank is approximately $106,000. This debt is secured by a security agreement covering the following collateral:

> All equipment of Debtor, whether now owned or hereafter acquired; including but not limited to ... tractors pickups combine and all other farm equipment
> All *farm products* of Debtor, *whether now owned or hereafter acquired*, including but not limited to (i) all poultry and *livestock* and their young, *products thereof and produce thereof*, (ii) all crops, whether annual or perennial, and

the products thereof, and (iii) all feed, seed, fertilizer, medicines and other supplies used or produced by Debtor in farming operations [hereafter a description of the relevant real estate and its record owner follows]

ACCOUNTS, CONTRACT RIGHTS AND OTHER RIGHTS TO PAYMENT: Each and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by Debtor, out of a rendering of services by Debtor, out of a loan by Debtor, out of the overpayment of taxes or other liabilities of Debtor, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which Debtor may at any time have by law or agreement against any account debtor or any other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including but not limited to all present and future debt instruments, chattel papers, accounts and contract rights of Debtor.

GENERAL INTANGIBLES: All general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, copyrights and trademarks

[T]ogether with *all substitutions and replacements for any of the foregoing property* not constituting consumer goods and together with proceeds of any and all of the foregoing property and, in the case of all intangible Collateral, together with (i) all accessories, attachments, parts, equipment, accessions [sic] and repairs now or hereafter attached or affixed to or used in connection with any such goods, and (ii) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods.

(Emphasis added.)

Thus, in essence, the security agreement includes as collateral farm equipment, farm products such as livestock and the products and produce of such livestock, accounts, contract rights, general intangibles, and all substitutes and replacements for any of the foregoing.

In July, 1986 debtor Grunzke moved the bankruptcy court for a "Determination as to Entitlement of the Proceeds of the Dairy Termination Program." The motion was heard on debtor's affidavit and memorandum, the bank's memorandum in opposition, and upon arguments of counsel. The bank argued that it was entitled to the proceeds of the Dairy Termination Program by virtue of its blanket security interest.

The bankruptcy court reasoned that the proceeds of the Dairy Termination Program were neither payments for the cattle nor for the proceeds or offspring of the cattle, but were instead compensation for future income lost by the debtor's forebearance from engaging in milk production for the five-year period mandated by the Dairy Termination Program contract. The bankruptcy court concluded that the Dairy Termination Program proceeds were a contract involving future income, entered into by the debtor after the filing of the petition for bankruptcy, and therefore the bank's security interest in those proceeds was cut off by 11 U.S.C. § 552(a), which states:

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

Thus the bankruptcy court held that the bank was entitled to the proceeds of the slaughtered cows, which the bank had already received, and ordered that the bank be given a lien on the Dairy Termination Program proceeds to the extent that it could be shown that it was prejudiced by

way of receiving the slaughter value of the cows as opposed to the market value of the cows as a dairy herd. Tr. at 2–5.

The bank now appeals from the bankruptcy court's determination that the bank is not entitled to the full amount of the Dairy Termination Program proceeds.

## DISCUSSION

■ The bankruptcy court's findings of fact are not to be overturned unless clearly erroneous; however, the bankruptcy court's conclusions of law are subject to de novo review. *Martin v. United States,* 761 F.2d 472 (8th Cir.1985). The parties agree that there are no significant factual disputes involved in this case, and no testimony was taken by the bankruptcy court. The bankruptcy court's order was a determination of law, and accordingly, this appeal is subject to de novo review by the Court.

Based on the Court's de novo review of the files, records, proceedings, and arguments of counsel in this case, and upon review of the bankruptcy court's findings of law thereon, the Court will adopt the reasoning and conclusions of the bankruptcy court below.

■ The Court agrees that the proceeds of the Dairy Termination Program are not payments for either the cattle or the proceeds or offspring of the cattle. Instead, the purpose of the Dairy Termination Program payments is to compensate the farmer for future income he or she loses by agreeing to get out of the milk production business and stay out for a period of five years. The payments are calculated and based upon factors which are particular to the business production of the individual farmer, *e.g.,* the size of the farmer's particular herd, the history of the farmer's production output and income, etc. These are factors unique to the expertise and business ability of the individual farmer, and are not related to the cows themselves.

Under 11 U.S.C. § 552(a), the appellant bank has no interest in post-petition income earned by a debtor, and therefore cannot have any interest in payments made to the debtor in consideration of future income lost by virtue of the debtor's entry into the Program post-petition. The bank had a security interest in the cattle, not in the debtor farmer's farming expertise. Under the terms of the Dairy Termination Program, the cattle were sold for slaughter value. The bank received the proceeds from the slaughter of the cattle. Because the slaughter value of the cattle may not be the same as the market value of those same cattle as a dairy herd, the bank is entitled to a lien upon the Dairy Termination Program proceeds to the extent that the bank can show that it was prejudiced by having to sell the cattle, which the bank had a pre-petition security interest in, at slaughter value rather than at the market value of the cattle as a dairy herd.

Accordingly, based upon the Court's de novo determination of the files, records, proceedings, and arguments of counsel, and upon the Court's de novo review of the bankruptcy court's findings of law,

**IT IS ORDERED** that the amended order of the bankruptcy court, dated August 22, 1986, is affirmed.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**