**LISBON BANK AND TRUST COMPANY, Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

**No. C87–0050.**

United States District Court, N.D. Iowa, Cedar Rapids Division.

Dec. 29, 1987.

Eric W. Lam, Steven P. Greiner, Cedar Rapids, Iowa, for plaintiff.

Paul C. Lillios, Asst. U.S. Atty., Cedar Rapids, Iowa, for defendant.

### ORDER

HANSEN, District Judge.

This matter is before the court on plaintiff Lisbon Bank and Trust Company's motion for summary judgment, filed July 2, 1987. Motion denied.

On October 25, 1982, Lisbon Bank and Trust Company (the Bank) entered into a security agreement with Dean and Mary Gerdemann, where the Gerdemanns granted a security interest to the Bank in all the Gerdemanns' following described property:

> First security interest in all machinery and equipment, farm products, including but not limited to, crops, livestock, and supplies used or produced in farming operation, and contract rights, or proceeds of any or all of same. Livestock to include all increase additions, and substitutions as well as proceeds of sale thereof.

This security agreement was perfected by filing a financing statement on November 3, 1982. Later, the Bank also obtained an additional perfected security interest in certain livestock.

The Gerdemanns became participants in the Dairy Termination Program, a government farm program administered by defendant Commodity Credit Corporation (CCC) of the United States Department of Agriculture. The purpose of the program is to reduce the quantity of milk marketed for commercial use, thereby stabilizing milk prices, decreasing the existing milk surplus, and lessening the cost of storing surplus dairy commodities.

Under the program, dairy producers such as the Gerdemanns entered into contracts with the CCC. The contract required the dairy producer to either slaughter or export his or her entire herd of dairy cattle by the end of the contract disposal period. The milk producer could not acquire any interest in any other dairy cattle or acquire a proprietary interest in any milk production facilities for a period of five years.

The dairy farmer enters the program by submitting a bid, based upon a dollar per hundred weight of milk produced. The bid is multiplied by the contract base, which is the milk producer's total milk production during the lower of two designated one-year periods: July 1, 1984 through June 30, 1985, or January 1, 1985 through December 31, 1985. The resulting figure determines the total payment to be received by the milk producer in return for disposing of his or her dairy cattle and refraining from milk production for the five year period. 7 U.S. C. § 1446; *Grunzke v. Security State Bank of Wells,* 68 B.R. 446, 447 (D.Minn. 1987).

On May 22, 1986, Dean Gerdemann granted the Bank an assignment of payments due to Dean Gerdemann from the CCC pursuant to the Dairy Termination Program. The CCC, however, set off against the amount due Gerdemann under the Dairy Termination Program the amount owed by the Gerdemanns to the CCC under a different loan program. The Bank now seeks to recover from the CCC the total amount due to Gerdemann pursuant to the Dairy Termination Program. The Bank contends that its perfected security interest in the Gerdemanns' "livestock, ... and contract rights, or proceeds of the same" entitles the Bank to the Dairy Termination Program payments.

The CCC does not contest the facts asserted by plaintiff, but rather maintains that the Bank lacks any security interest in the program payments, and that the CCC correctly asserted its right of setoff.

Summary judgment should not be entered unless the record indicates that there is no "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). Summary judgment may be appropriate here, as there are no genuine

issues of material fact to be tried and only questions of law to be resolved.

## A. Are dairy termination program payments "proceeds?"

■ The parties contest whether the Dairy Termination Program payments constitute "proceeds" of livestock under the security agreement and under Uniform Commercial Code § 9–306(1). Section 9–306(1) defines proceeds as including "whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of." Iowa Code § 554.9306(1).[1]

Two federal district courts which have considered this issue have rejected plaintiff's argument that payments under the Dairy Termination Program constitute proceeds of livestock. *Bank of North Arkansas v. Owens*, 76 B.R. 672, 673 (E.D.Ark. 1987); *Grunzke v. Security State Bank of Wells*, 68 B.R. at 449. This court agrees with the conclusions of the Minnesota and Arkansas courts. The program payments are not for the sale or disposition of the dairy cattle, but rather are contract receipts based upon the farmer's promise to get out of the milk production business for five years. The payments are calculated and based upon factors which are particular to the business production of the farmer and not to the cows themselves. *Grunzke*, 68 B.R. at 449. *See also In re Frasch*, 53 B.R. 89, 90 (Bankr.D.S.D.1985) (milk diversion program payments are not the proceeds of anything).

In granting the plaintiff a security interest in the proceeds of their livestock, the Gerdemanns pledged the value received from the sale or disposition of their livestock. Under the Dairy Termination Program, the Gerdemanns had to slaughter or export their cattle. The proceeds of the cattle was the money received from the sale of the cattle, money the Gerdemanns received, and receipts upon which plaintiff's lien applied, and were not the government program payments made for the purpose of inducing the Gerdemanns to refrain from dairy production.

Those cases holding that payments made under the 1983 payment in kind (PIK) crop program were proceeds do not determine the issue *sub judice*. First, the courts are split on the issue, with more recent cases holding that PIK payments are not proceeds. *See Matter of Schmaling*, 783 F.2d 680 (7th Cir.1986). Second, the PIK program is distinguishable from the Dairy Termination Program. The PIK program was designed to take crop land out of production by giving program participants commodity certificates in lieu of grain from the land taken out of production. In contrast, the Dairy Termination Program does more than remove milk cows from production for a year; rather it eliminates the dairy farmer as a producer of milk for a five year period. During that period the dairy farmer cannot own any other dairy cattle or any interest in milk production facilities. Unlike the PIK payments, which are directly related to the secured property, the Dairy Termination Program payments are based upon the quantity of milk that was produced by the dairy farmer's operation rather than being based on the number of cows which were sold. Because the Dairy Termination Program payments are not based upon the disposition of secured property, those cases holding that PIK payments are the proceeds of security interests in crops do not determine the outcome here.

## B. "Contract rights" rightly construed

■ While the court does not find that the security agreement provision pledging "proceeds" grants a security interest in Dairy Termination Program payments, the Gerdemanns' granting of a security interest in contract rights to the Bank does encompass the program payments. The Gerdemanns entered into a contract with the CCC which required the CCC to make payments to the Gerdemanns. The phrase "contract rights" fairly describes the Gerdemanns' entitlement to the program payments and makes possible the identification of the program payment as secured property. *See Uniform Commercial Code*

1. The parties agree that state law and the Iowa Uniform Commercial Code are the controlling authorities as to the extent of the Bank's security interest.

§ 9–110 official comment (1978); Iowa Code § 554.9110. Courts have commonly described payments under similar farm programs as contract rights. *See, e.g., In re Sumner,* 69 B.R. 758, 764 (Bankr.D.Or. 1986) (diversion program payments are generally intangibles, contract rights or accounts); *In re Mattick,* 45 B.R. 615, 617 (Bankr.D.Minn.1985) (PIK payment is "simply a contract right"); *In re Fowler,* 41 B.R. 962, 963 (Bankr.N.D.Iowa 1984) (government program creates a contract right); *Matter of Sunberg,* 35 B.R. 777, 784 (Bankr.S.D.Iowa 1983) (PIK payments are proceeds earned under a contract right), *aff'd,* 729 F.2d 561 (8th Cir.1984).

In agreeing with the result of the bankruptcy court in *Matter of Sunberg,* 35 B.R. 777, the Eighth Circuit held that a security agreement granting security interests in "contract rights, accounts and general intangibles" subjected PIK payments to the creditor's security interest. *In re Sunberg,* 729 F.2d 561, 562 (8th Cir.1984).[2] Since the Eighth Circuit did not find that PIK payments were proceeds, other courts have relied on the Eighth Circuit's opinion in *Sunberg* in holding that government farm payments are intangibles and not proceeds. *Matter of Schmaling,* 783 F.2d at 683; *Bank of North Arkansas v. Owens,* 76 B.R. 672, 674 (Bankr.E.D.Ark.1987). Under all of these cases, it is clear that the Program payments involved in the case at bar can be considered as intangible property, or more specifically as a contract right.

The defendant argues that since the words "contract rights" were eliminated from § 9–106 of the Uniform Commercial Code in the 1972 amendments to the Uniform Commercial Code, the grant of a security interest in "contract rights" is of no value. The 1972 amendments to the Uniform Commercial Code were adopted in Iowa in 1974. 1974 Iowa Acts Ch. 1249 § 33. Thus, the government apparently contends either that security interests cannot be granted in "contract rights," or that "contract rights" is an insufficient description of the collateral. Citing *In re Sun-*

*berg,* 729 F.2d at 562, defendant contends that the requisite description is "general intangibles."

Prior to 1972, the U.C.C. classified intangible rights into three categories: accounts, contract rights, and general intangibles. *Uniform Commercial Code, 1972 Official Text Showing Changes Made in Former Text of Article 9, Secured Transactions and Reasons For Changes; General Comment on the Approach of the Review Committee for Article 9* [hereinafter General Comment to 1972 Changes] § E. The distinction between contract rights and accounts depended on whether performance had occurred by the person to whom the monetary obligation was owing. General Comment to 1972 Changes, § E; *Uniform Commercial Code* § 9–106, reasons for 1972 change. Prior to performance a contract right exists, and after performance the collateral becomes an account. Alternatively stated, a "contract right" becomes an "account" by performance and the "account" is the proceeds of the "contract right."

The Review Committee for Article 9 questioned the need for this distinction and proposed broadening the definition of account in § 9–106 to include rights prior to performance and to eliminate "contract rights" as a category of intangible property. General Comment to 1972 Changes, § E.

The amendments did not prohibit security agreements in rights under a contract prior to performance, nor did the amendment preclude security agreements from describing this type of collateral as "contract rights." "[T]he code requires 'no magic or precise form' to evidence a possible security interest." J. White, R. Summers, *Uniform Commercial Code,* p. 904 (2d 1980). The only requirement for an adequate description is that it allows identification of the collateral as secured property. Here the phrase "contract rights" allows identification of contract payments

2. The Circuit Court did not rely on the bankruptcy court's rationale that PIK payments were "proceeds earned under a contract right."

pursuant to government farm programs. This is especially true, given the importance and awareness of the role of federal farm programs in financing farm operations. *In re Sunberg,* 729 F.2d at 562. The security agreement in this case is sufficient to grant a security interest to the plaintiff in payments due to the Gerdemanns pursuant to the Dairy Termination Program.

### C. Is the CCC's setoff valid?

■ Federal regulation 7 C.F.R. § 13.5(a) states:

> § 13.5 **Conditions under which setoff or withholding shall not be made.**
>
> Setoff or withholding shall not be made:
>
> (a) If the amount available for setoff or withholding represents loan or purchase proceeds with respect to a commodity which is subject to the rights of the holder of a valid enforceable prior lien on such commodity. However, any amount that exceeds the amount of the prior lien shall be available for withholding or setoff.

Relying on this regulation, the Bank argues that because the amount available for setoff represented purchase proceeds with respect to the dairy cows, the CCC was prevented from exercising its right of setoff. Although the regulation suffers from a lack of clarity, the regulation does not appear to protect the Bank's interest in the Gerdemanns' contract rights to receive Dairy Termination Program payments.

In determining the applicability of the regulation to the case at hand, it must be remembered that what the Gerdemanns were entitled to receive from the defendant were cash payments for terminating their production of dairy products. In contrast, the regulation applies to "loan or purchase proceeds." The program payments were not the receipts of any *loan.* Nor were the payments the remuneration of any *purchase* made by the CCC. The only thing that the CCC might have arguably "purchased" was the Gerdemanns' promise to dispose of their dairy herd and cease producing milk for a period of five years.

Such a "purchase" is not within the meaning of the regulation which deals with "purchase proceeds with respect to a *commodity.*" The CCC payments purchased neither cows nor milk, nor any commodity of any kind. Commodities are movable articles of value, such as goods, wares, and merchandise. *Black's Law Dictionary,* 248 (5th ed. 1979). Finally, as the court has previously determined, the program payments were not *proceeds* received from the sale of the dairy herd.

Since the rights and duties of federal agencies in administering federal program payments are governed by federal law (*see U.S. v. Landmark Park & Associates,* 795 F.2d 683, 685 (8th Cir.1986)), and since the regulation prohibiting setoff did not apply to the Gerdemanns' Dairy Termination Program payments, the CCC was at liberty to set off against those payments any amount the Gerdemanns may have owed to the CCC, pursuant to 7 C.F.R. § 13.4. The Bank's status as a specific assignee of Gerdemanns' payments gives the Bank no greater priority rights than it would have under its security agreement for the reason that the debt owed by Gerdemann was already entered on the debt record of the ASCS county office prior to the execution of the assignment. *See* 7 C.F.R. § 13.8.

### ORDER:

Accordingly, It Is Ordered:

Plaintiff Lisbon Bank and Trust Company's motion for summary judgment, filed July 2, 1987, is denied.