The BANK OF NORTH ARKANSAS, Appellant,

v.

Jimmy Carroll OWENS, Bank of Salem, The United States of America Farmers Home Administration, Appellees.

No. 87–2167.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1988.

Decided Aug. 29, 1989.

John C. Gregg, Batesville, Ark., for appellant.

C. Dwayne Plumlee, Salem, Ark., for appellees.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The Bank of North Arkansas appeals from a district court[1] order, 76 B.R. 672 (1987), affirming the bankruptcy court's decision that North Arkansas did not possess a perfected security interest in dairy termination payments received by debtor Jimmy Owens. Owens, who had pledged his dairy herd to secure a loan with North Arkansas, contracted with the federal government to stop producing milk for five years, in return for the termination payments. This agreement also required Owens to sell his dairy cows for slaughter or export. The cattle were sold, with the sale price being prorated between North Arkansas and the Bank of Salem, which also held a perfected security interest in the herd. North Arkansas argues that it, rather than Salem, is entitled to the termination payments, either as "proceeds" from the cattle sale, or as "contract rights, accounts or general intangibles." We affirm the judgment of the district court.

I.

The facts in this case are not disputed. On May 17, 1983, Owens borrowed $175,-254.75 from North Arkansas, granting a security interest that North Arkansas promptly perfected.[2] He borrowed an additional $52,500 from Salem on January 15, 1984, securing the debt with an interest in 75 head of Holstein cattle and other general intangibles. The Salem debt was further secured with an additional 50 head of Holstein heifers on July 22, 1985.[3] Owens was

---

1. The Honorable Elsijane T. Roy, United States District Judge for the Eastern and Western Districts of Arkansas.

2. North Arkansas' security agreement covered specific items of Owens' farm property, including 70 head of Holstein heifers, 78 head of dairy cattle, and certain pieces of farm machinery. The property covered by the agreement included:

   (a) All * * * property specifically listed and, if a general description is used (whether or not any specific property is listed), in all

* * * property fitting the general description; and
   (b) all benefits which arise from the described property, including cash or non-cash proceeds, insurance benefits, interest, dividends, stock splits, and voting rights and,
   (c) any property which is now or hereafter becomes attached to, a part, or results from the described property.
Record at 75–76.

3. Owens used broader language in each of his contracts with Salem. These agreements granted:

unable to meet his debts, and sought protection in Chapter 11 bankruptcy proceedings.

Before the Chapter 11 filing, however, Owens had successfully applied to participate in the "Dairy Termination Program" run by the United States Department of Agriculture, Agricultural Stabilization and Conservation Service (ASCS). This program, discussed at length in the next section, provided him with total payments of $92,296.05, eighty percent of which he received immediately. Owens executed an assignment of these payments to the Farmers Home Administration (FmHA), as partial satisfaction of debts he owed to that agency. As required by the dairy program, Owens sold his 148 head of cattle, prorating the proceeds between North Arkansas and Salem.[4] Owens continued to owe North Arkansas a balance of $107,-279.76. In a separate but related action, North Arkansas was awarded equipment valued at $15,000, leaving a balance owed of approximately $92,000.

North Arkansas considered itself entitled to the dairy payments to pay the remaining debt, and it brought the present claim in bankruptcy court, naming Owens, Salem, and the FmHA as adversary parties. Salem answered that it too claimed a security interest in the payments, and that its claim was superior to that of North Arkansas. FmHA's answer admitted inferior priority to that of Salem, but alleged that North Arkansas' security agreement did not include any of the payments. Thus, if North Arkansas' security agreement covered the dairy termination payments, it had the superior claim. If the agreement did not encompass these payments, Salem was entitled to the money, followed by the FmHA.

North Arkansas advanced two theories as to why its agreement with Owens applied to the dairy payments. First, it argued that the payments were proceeds from the disposition of Owens' cattle. Second, it stated that even if the payments were not proceeds, they were at least contract rights or general intangibles, and the security agreement in question sufficiently described them to create a valid security interest. The bankruptcy court rejected both arguments. Citing *In re Frasch*, 53 B.R. 89 (Bankr.D.S.D.1985), it concluded that the dairy payments were made by the government in return for an agreement to refrain from milk production, not for the cattle. Additionally, the bankruptcy court found no other language in the agreement that might cover the dairy payments. North Arkansas appealed to the district court, but that court affirmed on the basis of the same analysis. The present appeal followed.

## II.

■ We first consider whether Owens' dairy termination payments constitute proceeds from the sale of his cattle. Arkansas law adopts the Uniform Commercial Code definition of proceeds as "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds." Ark.Code Ann. § 4–9–306(1) (1987). The Arkansas courts have not decided how this section applies to dairy payments, and courts interpreting the laws of other states have split in their results. *See, e.g., Lisbon Bank and Trust Co. v. Commodity Credit Corp.*, 679 F.Supp. 903 (N.D.Iowa 1987) (payments not proceeds of livestock under Iowa law); *In re Hofstee*, 88 B.R. 308 (Bankr.E.D.Wash.1988) (payments are cattle proceeds under Washington law). Our recent decision of *In re Kingsley*, 865 F.2d 975 (8th Cir.1989), holding that federal diversion and deficiency

All my cattle, and the increase, produce and products thereof, now owned or hereafter acquired, whether by purchase or natural increase, (together with all rights of payment of money now owed or hereafter owed to debtor, whether due or to become due and whether or not earned by performance, including, but not limited to accounts, contract rights, chattel paper, instruments and general intan-

gibles, all of which are hereafter called receivables. (sic).
Record at 77.

**4.** The regulations require sale for either slaughter or export, but the record is silent as to the manner of sale in this case. Whatever the purpose of this particular sale, our analysis is unchanged.

payments are not crop proceeds under North Dakota law, requires us to begin our analysis by thoroughly examining the government program involved.

The Dairy Termination Program is designed to reduce the amount of commercially available milk, in the hopes of stabilizing milk prices. *See In re Weyland*, 63 B.R. 854, 857 (Bankr.E.D.Wis.1986); 7 C.F.R. § 1430.450 (1988). Participation is voluntary; every producer desiring to enter the program must submit a bid to the Commodity Credit Corporation (CCC). These bids reflect the price that each producer would demand to remain outside the dairy business for five years. The CCC evaluates each bid, considering both the price requested and the amount of milk that would be removed from the market. The CCC then notifies each chosen participant of approval, and executes a contract binding the producer to the restrictions of the program.[5]

These restrictions are designed to cut nationwide milk availability in two ways. First, the individual producer is totally barred from the dairy business during the contract period. This ban extends to his immediate family, and forbids the acquisition of any personal interest in any phase of the milk production process. *See* 7 C.F.R. § 1430.457(b) (1988). Second, the equipment and facilities of the contractor are prohibited from producing any milk. All dairy cattle must be sold for slaughter or export, to ensure that they produce no further domestic milk. *See* 7 C.F.R. § 1430.457(a) (1988). Moreover, the contractor must prevent his facility from being used by others to produce milk during the contract period, even if the premises are sold. *See* 7 C.F.R. § 1430.457(c), (d) (1988). Breach of any of these provisions subjects the contractor to penalties under the program.

Viewing these regulations in light of *Kingsley*, we conclude that the dairy payments do not constitute proceeds from the sale of the cattle, but instead "are based on contract rights having origin in the statutory and regulatory fabric of the [Dairy Termination Program] * * *." *Kingsley*, 865 F.2d at 980; *see also Rainier Nat'l Bank v. Bachmann*, 111 Wash.2d 298, 311, 757 P.2d 979, 986 (1988) (Dore, J., dissenting). The government agrees to pay a certain sum of money based on the milk producer's estimated potential milk income over the next five years.[6] In consideration for these payments, the producer agrees to take three steps to leave the dairy business: he must sell his current herd for either slaughter or export, agree to abandon the dairy business for five years, and prevent other dairy producers from using his production facilities.

The question asked by *Kingsley* is whether these government payments are earned through the sale of secured property, or by other means. *Kingsley*, 865 F.2d at 980. It is evident that the Dairy Termination Program does not compensate producers for the loss of their cattle, but instead for their agreement to abandon the milk business for five years. *See Grunzke v. Security State Bank of Wells*, 68 B.R. 446, 449 (D.Minn.1987); *Lisbon*, 679 F.Supp. at 905; *Frasch*, 53 B.R. at 90. The government does not take possession of the dairy herd, but merely requires that it be sold for slaughter or export. The funds received from that sale go to the producer or his assignees, not to the government, and in this case those funds were prorated between North Arkansas and Salem. Further, the payments "are calculated and based upon factors which are particular to the business production of the farmer and not to the cows themselves." *Lisbon*, 679 F.Supp. at 905; *see also Ranier*, 111 Wash.2d at 312, 757 P.2d at 987 (Dore, J.,

---

5. The contract actually signed by Owens is not in the record before us, so we look to the program regulations to determine the conditions Owens was required to accept.

6. 7 C.F.R. § 1430.459(a) (1988) sets the payment levels as the product of the bid price submitted and the contract base. The contract base, com-

puted by the methods of 7 C.F.R. § 1430.455 (1988), seeks to estimate the total amount of milk that would have been produced had the contracts not been signed. Once the total payment amount is determined, the producer may choose from one of two accelerated payment schedules. *See* 7 C.F.R. § 1430.459(f) (1988).

dissenting). These factors are related to the producer's facilities and past skill at milk production.

Under these circumstances, we have no difficulty in concluding that the dairy payments were not proceeds from the sale of the dairy herd. The term "proceeds" in North Arkansas' security agreement entitled it to the sale price of the cows, and that is what they received. Since the cows were sold for slaughter or export, rather than for domestic dairy use, it is possible, indeed probable, that the actual sale price was below the fair market value for dairy cattle. North Arkansas has made no claim that it is entitled to the dairy termination payments to the extent that they may reflect the differential between the sale price and the fair market value, *i.e.*, the prejudice from forced sale conditions. *See Grunzke*, 68 B.R. at 449. Had such a claim been raised, a number of difficult issues might have been presented to the bankruptcy court, but as it was not asserted or considered by the bankruptcy court or district court, it is inappropriate that we consider such hypothetical but unasserted and unlitigated questions in reaching our decision.

### III.

■ Finally, we consider whether North Arkansas is entitled to the dairy termination payments through some other portion of its security agreement. We conclude that it is not. North Arkansas argues that its security agreement is so broadly worded that the parties intended contract rights or general intangibles to be included, and that the dairy payments fall within this category. We agree with the district court that the other language in the agreement is too vague to reasonably describe the dairy termination payments.[7]

We therefore reject North Arkansas' arguments, and affirm the judgment of the district court.

---

7.  North Arkansas points to language in its security agreement entitling it to all "benefits" and "results" from the cattle. We have already stated, however, that Owens' dairy payments had nothing to do with his cattle. By comparison,

BOWMAN, Circuit Judge, concurring.

As the opinion of the Court points out, *ante* at p. 334, North Arkansas has made no claim that it is entitled to the dairy termination payments to the extent that they may reflect a differential between the sale price of the dairy cattle and their fair market value. The Court therefore correctly declines to consider the merits of this hypothetical claim. Had North Arkansas asserted such a claim, however, I believe it might well have been meritorious. The Dairy Termination Program encourages the reduction of milk production by giving producers a substantial incentive to abandon the milk business. To qualify for the program, a dairy farmer must sell his herd for slaughter or export. This feature of the program raises the possibility that the actual sale price may be below the price that could have been obtained had the herd been sold for domestic dairy use. Viewed from the perspective of a lender who has a security interest in the herd and in proceeds from the sale of the herd, a sale for slaughter or export thus may result in an impairment of collateral—an impairment of collateral that the program encourages the farmer to bring about. In this way, there may be what amounts to an uncompensated "taking" of a portion of the collateral for a public purpose. Such uncompensated takings could be avoided by treating Dairy Termination Program payments as "proceeds" from the sale of the herd to the extent that the sale for slaughter or export is made at a price below the price the herd would bring if sold for domestic dairy use. The views expressed herein are of course only tentative, since we have not had the benefit of briefing or argument on this issue.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent. While I agree with much of what is written in the majori-

Salem's comprehensive language of "accounts, contract rights, chattel paper, instruments and general intangibles" provides an excellent example of how North Arkansas could have expanded the scope of its security interest.

ty and concurring opinions, I believe that this panel should reach the issue of whether North Arkansas has a claim to the Dairy Termination Payments due to the forced sale of its collateral. As the concurring opinion ably notes, this forced sale undoubtedly impaired the rights of North Arkansas in the collateral. While neither the majority nor the concurring opinion felt that this panel should decide this question, I disagree and would decide it in the manner described in Judge Bowman's concurrence. Therefore, I would allow North Arkansas to assert an interest in the Dairy Termination Payments to the extent of the difference in the fair market value of the cattle when used for dairy production and the proceeds from the sale of the cattle for slaughter or export.

Accordingly, I dissent.