In re Martin and Cynthia
**LESMEISTER,**
Debtors.

**Wayne Drewes as bankruptcy trustee for Martin and Cynthia Lesmeister, Plaintiff,**

v.

**Martin Lesmeister and Ag Acceptance Corporation, Defendants.**

**Bankruptcy No. 99–30245.**

United States Bankruptcy Court,
D. North Dakota.

Nov. 24, 1999.

---

Kip M. Kaler, Fargo, ND, for plaintiff.

David L. Johnson, Fargo, ND, for Martin Lesmesiter.

Jon R. Brakke, Fargo, ND, for Ag Acceptance Corporation.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the Court stems from a Complaint filed by Wayne Drewes, Chapter 7 Trustee, on June 23, 1999, seeking to recover for the estate a government disaster payment in which Defendant Ag Acceptance Corporation (Ag Acceptance) claims a security interest. Two issues are presented. First, whether the disaster payment constitutes property of the estate under section 541 and secondly, whether Ag Acceptance has a valid and persisting security interest unassailable by the Trustee. Trial was held on October 21, 1999. From the evidence presented, the relevant facts are set forth as follows:

### 1.

### *Findings of Fact*

The Lesmeisters conducted a small grain farming operation in Eddy County, North Dakota, and obtained a series of operating loans from Ag Acceptance with the last and most recent loan being for the 1998 season. By note dated December 11, 1997, Ag Acceptance extended the Lesmeisters the sum of $155,000.00 secured by security agreements entered into on February 28, 1996, December 19, 1996, and December 11, 1997. The February 28, 1996 security agreement provided for a security interest in the following described property:

All of the debtors now owned or hereafter acquired feed, seed, chemicals, fertilizer, and other supplies; all owned or hereafter acquired warehouse receipts or other documents (negotiable or non-negotiable) issued for storage of crops; all now owned or hereafter acquired entitlements and payments (whether in cash or in kind) arising under governmental agricultural subsidy, deficiency, diversion, disaster, conservation, or similar programs but specially excluding any property which is "crops" as defined by section 35–05–04, N.D.Cent.Code (1989).

In nearly identical form, the other two security agreements provided for a security agreement in:

All of debtors now owned or hereafter acquired feed, seed, chemicals, fertilizer, and other supplies; all now owned or hereafter acquired warehouse receipts or other documents (negotiable or non-negotiable) issued for the storage of crops; all now owned or hereafter acquired accounts, chattel paper, documents, instruments, harvested farm products, entitlements and payments (whether in cash or in kind) arising under any governmental agricultural or farming programs, and goods (specifically excluding any such items or parts of said items which are "crops" as defined by N.D.Cent.Code § 35–05–04.)

The foregoing security interests were duly perfected by the filing of U.C.C.–1 financing statements.

With the funds thus advanced, Lesmeisters purchased the necessary fertilizer, herbicides, and chemicals from the local elevator. Ag Acceptance, however, filed an agricultural supplier's lien claiming that on July 16, 1998, it had made a credit sale to Lesmeister.

1998 turned out to be a poor year due to drought and other conditions, prompting Lesmeisters to file for relief under Chapter 7 on February 10, 1999, leaving unpaid the sum of $60,358.00 from the 1997 Ag Acceptance operating loan.

Congress, in an effort to assuage the economic hardship brought on by the 1998 drought, passed the Agricultural, Rural Redevelopment, Food and Drug Adminis-

tration, and Related Agencies Appropriations Act, 1999 (Pub.L. 105–277, 112 stat. 2681, Oct. 21, 1998), popularly called the Crop Loss Disaster Assistance Program (CLDAP) administered by the Farm Service Agency of the U.S. Department of Agriculture. The statute itself became effective on October 21, 1998, and was implemented through regulations promulgated by the Department of Agriculture with an effective date of April 15, 1998. *See* 7 C.F.R. 1477 *et seq.*

Encouraged by Ag Acceptance, Lesmeisters, on April 27, 1999, made application for program benefits stemming from their 1998 crop losses. Beyond signing up for the program, Lesmeisters did nothing else as their eligibility and benefit amounts were determined by the Farm Service Agency from historical crop yields, information on hand, and the historical fact of a crop disaster having occurred for the 1998 crop year. From this information the Farm Service Agency for Eddy County projected Lesmeisters' payment for 1998 losses at $28,795.00 and on June 3, 1999, made a disbursement to them in this amount. Except for $2,795.00 that was spent immediately on loan repayments and insurance, $26,000.00 of the disaster payment was deposited into a checking account on July 26, 1999. Despite being aware that the Chapter 7 bankruptcy trustee was making a claim of ownership, the Lesmeisters spent an additional $9,165.87 reducing the balance remaining of the disaster payment as of October 20, 1999, to $16,834.13.

### Conclusions of Law

The Trustee seeks recovery of the CLDAP payment inclusive of the sums spent by Lesmeisters as well as the balance either retained by them or paid over to Ag Acceptance in recognition of security interests. In several briefs, the Trustee appears to promote inconsistent legal theories, arguing in one that all acts and events giving rise to Lesmeisters' right to participate in the disaster program arise pre-petition making thereby, the right to payment akin to a pre-petition right of action. On the other hand, he argues in a later brief that Lesmeisters did not have an interest in payments until the program was implemented by adoption of C.F.R. regulations. In reconciling the Trustee's various statements, what he is apparently saying is that Lesmeisters had sufficient rights in the disaster payments to constitute pre-petition property of the estate as of the petition filing date, but such rights were insufficient under the Uniform Commercial Code for attachment of Ag Acceptance's security interest and thus, to the extent Ag Acceptance has a valid security interest, it did not attach until well within the ninety-day preference period of section 547 of the Bankruptcy Code and is therefore avoidable.

1.

Section 541 of the Bankruptcy Code provides in part:

> The commencement of a case under section 301 ... of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whoever held:
>
> (1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1).

█ The scope of the bankruptcy estate as defined above is very broad. *Garner v. Strauss*, 952 F.2d 232 (8th Cir.1991), *In re Swanson*, 873 F.2d 1121 (8th Cir. 1989). In essence, an estate includes almost any asset or interest of value a debtor has. The legislative history expresses the intent that tangible as well as intangible property, causes of action and all other forms of property are all to be included in the debtor's estate. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 82 (1978);

U.S.Code Cong. & Admin.News 1978; *see also Owen v. Owen*, 500 U.S. 305, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) (an estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance).

■ Inclusion into the bankruptcy estate of an interest in property for section 541 purposes does not depend upon that interest neatly fitting into a Uniform Commercial Code definition. One does not have to ascribe a particular Uniform Commercial Code characteristic to a property interest in order for that interest to become "property of the estate" in a bankruptcy context. Since the seminal case of *In re Schmaling*, 783 F.2d 680 (7th Cir. 1986), many courts in addressing the issue of whether a security interest in crops and their proceeds extends to various government payments as substitutes for the pledged crops, look to section 9–306(1) of the Uniform Commercial Code.[1] These courts regard property as a proceed if it is received in consequence of the disposition of collateral. *In re Kingsley*, 865 F.2d 975 (8th Cir.1989), *Bank of North Arkansas v. Owens*, 884 F.2d 330 (8th Cir.1989). This test has also, on occasion, been used in order to bring disaster payments paid in consequence of a crop loss into the bankruptcy estate. *In re Ring*, 169 B.R. 73 (Bankr.M.D.Ga.1993). In the context of section 541, however, the focus is not upon the detailed definition of "proceeds" found in section 9–306(2) of the Uniform Commercial Code but rather upon section 541(a)(6) of the Bankruptcy Code which, without any elaboration, brings into the estate any proceeds of or from "property of the estate." While the Uniform Commercial Code definition of proceeds has been useful to courts in the context of section 541, it is by no means mandatory to apply it in a bankruptcy context. What is essential to section 541(a)(6) is the notion of when a debtor acquires an interest in property as section 541(a)(1) includes *any* legal or equitable interest which is inherently a far more expansive concept than the restrictive Uniform Commercial Code definition of proceeds. Proceeds in the context of section 541(a)(6) then, is similarly more broad reaching than the U.C.C.–1 definition. Consequently, in addressing the question of whether CLDAP payments are property of the estate, one is not restricted to considering those payments solely in the context of them being proceeds from crops. In the unreported decision of *In re Bates*, Bankr.5–88–287 (Bankr.Minn.1990), relied upon by both the Trustee and Ag Acceptance, the court in considering the question of whether federal crop disaster payments were property of the estate under section 541(a)(1), did not resolve the issue in the context of whether or not the payments were crop proceeds. Rather, the court in that case considered the question to be whether the debtor had a legally cognizable property interest under the disaster relief act when he filed for bankruptcy. The court focused on the fact that all events establishing the debtor's right to payments *i.e.*, the 1988 drought and the date of enactment were all prepetition. Hence, the court believed the right to disaster payments was closely analogous to a right of action for damages not yet put into suit. This Court agrees with that analogy. For purposes of sec-

---

1. As enacted in North Dakota, section 9–306(1) of the U.C.C. states as follows: "proceeds" includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds. Money, checks, deposit accounts and the like are "cash proceeds." All other proceeds are "non-cash proceeds." N.D.Cent.Code § 41–09–27 (1997) (U.C.C. 9–306(1)).

tion 541 it is not necessary to resolve the issue in the context of crop proceeds for, as the Trustee himself concedes, the situation at bar is identical to that in *Bates.* Lesmeisters right to 1998 CLDAP payments is for purposes of section 541, best characterized as a pre-petition right of action-an unliquidated chose in action. Ag Acceptance agrees with the Trustee in this regard.

The effective date of the legislation creating a right to payments was October 21, 1998, and by that time all events (that is, crop losses) giving Lesmeisters a right to benefits, had occurred. All that remained was for Lesmeisters to complete the application for assistance which was a ministerial act in this Court's view. The Court believes that on October 21, 1998, Lesmeisters acquired a right to CLDAP proceeds and hence said proceeds must be regarded as property of the estate.

2.

█ If Ag Acceptance is to prevail it must do so on the vitality of its security agreements rather than on the strength of its agricultural supplier's lien as the Court does not regard it as a supplier. N.D.Cent.Code § 35–31–01 provides for a lien to any person who furnishes supplies, including seed, fertilizer and farm chemicals. Ag Acceptance is a lender and as such provided Lesmeisters with an operating loan. There is no evidence establishing that Ag Acceptance made a credit sale to Lesmeisters for their purchase of seed, fertilizer or any other input. It did not furnish supplies in the sense contemplated by section 35–31–01 and any lien claimed by reason of its agricultural supplier's lien must fail.

█ Ag Acceptance did, however, provide Lesmeisters with an operating loan for 1998 in the sum of $155,000.00 taking as security a security interest in "all now owned or hereafter acquired ... entitlements and payments (whether in cash or in kind) arising under any governmental agricultural or farm programs...." This language easily encompasses payments arising out of and in consequence of government programs like the CLDAP. Indeed, the Trustee himself concedes that by virtue of the respective security agreements, Ag Acceptance has a lien in all "government payments" but asserts in his post-trial brief that it was the Code of Federal Regulations that created a right to receive payment as the Code defined who could participate, the basis for participation, the acts necessary to participate and the amount of the payment. This argument appears contrary to his assertion that the situation is identical to *Bates, supra.*

Attachment is a prerequisite to enforcement of a security interest. Under North Dakota Century Code § 41–09–16 (U.C.C. § 9–203) attachment occurs when all of the following take place:

(a) the collateral is in possession of the secured party or the debtor has signed a security agreement containing a description of the collateral;

(b) the value has been given;

(c) the debtor has rights in the collateral.

█ Here there is no dispute over either of the first two requirements. Lesmeisters gave Ag Acceptance a security agreement covering existing or hereafter acquired government payments. This security was given to secure a rather substantial indebtedness. The question thus boils down to whether Lesmeisters had sufficient rights in the CLDAP payments for attachment to occur. Was it the effective date of the enactment-October 21, 1998, or was it when the Code of Federal Regulations defined the procedure by which one made an application? While section 541 sets out in broad stroke the scope of the debtor's estate, it does not provide any rules for determining whether

the debtor had a cognizable interest in property. Determination of the underlying rights in the property is an issue controlled by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), *In re Wade,* 219 B.R. 815 (8th Cir. BAP 1998). The Trustee and Ag Acceptance agree that all acts and events giving rise to Lesmeisters' right to participate in the program arose pre-petition. This right, says the Trustee, is analogous to a pre-petition right of action for damages. If so, and if these rights were sufficient to render the CLDAP payment property of the estate, then Ag Acceptance charges, they were also sufficient to allow attachment under N.D.Cent.Code § 41-09-16. Ag Acceptance is of the view that when a debtor has a legally enforceable right to an asset, he has sufficient rights under the Uniform Commercial Code for a security interest to attach. This Court agrees. In *Thompson v. Danner,* 507 N.W.2d 550 (N.D.1993), the supreme court discussed attachment and the necessary element of acquiring rights in the intended collateral. In that case the discussion concerned whether a debtor had rights in future crops sufficient to support attachment concluding that the crops themselves need not actually even be planted in order for a debtor to have rights sufficient for attachment. All that was necessary was that the debtor have a "proprietary interest" through leases or direct ownership of the land upon which the crops would eventually be grown. The property in which the creditor claimed an interest did not itself have to exist nor in the case of crops, even be planted. It would thus appear that the North Dakota Supreme Court takes a broad view indeed of the concept of "rights in property" similar to the approach taken in *Bates.* It is enough for attachment if the events giving rise to a claim or right of action have come

into existence. In the case at bar it was not the Code of Federal Regulations that created in Lesmeisters a right to CLDAP payments. They were farmers who had suffered a loss from drought and had a right to payments under the program the moment the Crop Loss Disaster Assistance Program became effective on October 21, 1998. This right was a proprietary interest sufficient for attachment to occur at that time. Hence, Ag Acceptance's security interest in government disaster payments attached on that date.

All prerequisites necessary for perfection occurred outside the ninety-day preference period of section 547(b)(4)(A) and therefore Ag Acceptance's security interest is unavoidable as a preference.

### Conclusion

Accordingly, and for the foregoing reasons, it is held that all crop loss disaster payments paid to the Debtors, Martin and Cynthia Lesmeister, for the 1998 crop losses in the sum of $28,795.00 constitute property of their Chapter 7 estate. Further, the Defendant, Ag Acceptance Corporation, has a valid and unavoidable security interest in all crop loss disaster payments with priority over any claim of the estate.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**