In the ESTATE OF Estel A.
WELCH, Deceased.

Opal Lorene WELCH,
Appellant–Respondent,

v.

LaVerne WELCH, Elsie Tippee, Personal Representative, Earlene Vaughn, Delores Metcalf, Helen Louise Robinson, Valeta June Walker, Maxine Bartles and Sue Brown, Respondents–Appellants.

No. WD 42644.

Missouri Court of Appeals,
Western District.

Aug. 28, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 2, 1990.

Application to Transfer Denied
Nov. 20, 1990.

John C. Milholland of Anderson & Milholland, Harrisonville, for appellant-respondent, Opal Lorene Welch.

John L. Pursley of McNabb & Pursley, Butler, for respondent-appellant, LaVerne Welch.

George M. Wolf of Field, Gentry, Benjamin & Robertson, P.C., Overland Park, Kan., John R. Loss of Field, Gentry, Benjamin & Robertson, P.C., Kansas City, for respondent-appellant, Delores Metcalf.

Before TURNAGE, P.J., and MANFORD and BERREY, JJ.

MANFORD, Judge.

This is an appeal from an interlocutory order, authorized by § 472.160, RSMo 1986, by the associate circuit court judge of Bates County, Missouri. The judgment is affirmed.

This appeal is a consolidation of two cases before this court. The appeals of Opal Lorene Welch, widow of Estel Welch, and Delores Metcalf, daughter of Estel Welch, are the only two appeals considered in this opinion. Since no briefs were filed by or on behalf of any other appellants, their appeals are deemed abandoned.

Appellants, Opal Lorene Welch and Delores Metcalf, present three points on appeal which, in summary, charge the circuit court erred (1) in allowing decedent's son, LaVerne Welch, respondent, monetary claims totaling $25,876.53 and his claims to specific personal property based on LaVerne and Estel Welch's partnership in the dairy business because the courts of Missouri have no jurisdiction to grant relief based on an illegal contract entered into between decedent and his son which was in violation of the son's agreement with the federal government not to participate in the dairy business under the Commodity Credit Corporation (C.C.C.) of the United States Department of Agriculture's "Dairy Termination Program"; (2) in refusing to include the lawn mower as exempt household property belonging to the widow, Opal Welch, as designated by § 474.250, RSMo 1986, and (3) in granting the widow, Opal Welch, $1,000 cash from the estate for one year's support in that, under Missouri law, the widow is entitled to an amount in cash sufficient to enable her to live by her previous standard.

Estel A. Welch (Estel) died testate on January 2, 1989, survived by his wife, Opal Lorene Welch (Opal) and seven adult children by a former marriage: Delores Metcalf, Earlene Vaughn, Helen Louise Robinson, Valeta June Walker, Maxine Bartles, Sue Brown, and LaVerne Welch (LaVerne). Estel and Opal were married on October 8, 1971 and lived on a farm owned solely by Estel. Estel's will, written in 1978, provided a one-eighth share of the estate for each of his heirs. Opal has elected to take against the will.

In April, 1986, respondent son, LaVerne, entered into a contract with the C.C.C. of the United States Department of Agriculture to participate in its Dairy Termination Program. LaVerne sold or slaughtered all dairy cows belonging to him in accordance with that contract. In November, 1986, Estel employed LaVerne in the capacity of a hired hand to milk cows. For milking, LaVerne was paid $550.00 per month and was reimbursed for any feed he provided, so long as LaVerne's compensation did not exceed one-half of the proceeds from Estel's milk sales to Mid–Am Dairy. At the time of Estel's death, LaVerne was milking 15 cows belonging to Estel. Additionally, LaVerne was milking 13 cows contributed to Estel's farm by Lane Welch, LaVerne's son and Estel's grandson. Lane was to receive either the calves from these cows, or proceeds from the sale of the calves. Estel was to receive all proceeds from the sale of milk and calves, except those calves from Lane's cows.

From November, 1986 until October, 1988, LaVerne milked the cows and provided feed. Estel paid LaVerne his wages but did not reimburse him for feed. From October, 1988 until January, 1989, Estel paid wages and reimbursed his son for feed provided.

Upon Estel's death, LaVerne continued the dairy operation by agreement with the personal representative of the estate, Mrs. Tippee, through April 14, 1989. Mrs. Tippee agreed to pay LaVerne $550.00 per month plus his social security contribution, and to reimburse him for feed he provided. LaVerne was not paid by Mrs. Tippee after March 1, 1989.

Appellants appeal from the order enforcing the contract between Estel and LaVerne. Appellants also appeal from the order denying Opal the lawn mower and limiting Opal's one-year statutory allowance for living expenses to $1,000.

Based on the evidence as deduced at trial, the court found that Estel and LaVerne had agreed that LaVerne would provide labor and feed and Estel would provide the cows and a place to milk them. The court further found LaVerne was to be paid $550 per month and be reimbursed for the grain he fed the cows up to the point where his total compensation equalled one-half of the milk check paid to Estel Welch by Mid–American dairies. The court stated that the evidence indicated LaVerne provided approximately $12,000 b.u. of grain during 1987 and 1988, and half of the milk check after allowing for his compensation was $16,675.85, or $1.39 per bushel or slightly more than half of its actual value. The court further stated that LaVerne pro-

vided $2,800 worth of hay and is entitled to be paid for it. The court found LaVerne was entitled to one-half of the calf crop, which the evidence indicated was worth $3,900. From the foregoing evidence, the court found that LaVerne was entitled to compensation in the amount of $23,375.85.

Based on the evidence, the court found that LaVerne was the owner of certain personal property on the decedent's estate and awarded LaVerne $1,370 for its value, as well as other personal property. The court also awarded LaVerne $1,130.68 in back wages owed to him for work performed for the estate from March 1, 1989 through April 14, 1989. The court also stated, after hearing the evidence, that the widow was not entitled to the riding lawn mower. Further, the court found the widow was entitled to $1,000 for her one year allowance. The court arrived at that sum by taking into account that the widow had taken all household goods and appliances, including a large number of antiques, almost $5,000 of jointly owned funds, and she would receive one-third of the estate by electing to take against her will, rather than one-seventh [sic] as the decedent directed in his will. The court's order was entered and this appeal followed.

■ This is a court-tried action. This court, therefore, affirms the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In Re Estate of Miles*, 632 S.W.2d 323, 325 (Mo.App.1982). This court defers to the trial court's assessment of the credibility of the witnesses. *Davis v. Davis*, 693 S.W.2d 879, 881–882 (Mo.App.1985). After reviewing the full record of the trial court, it is apparent the trial court did not abuse its discretion in awarding LaVerne cash and personal property.

■ Appellants contend that the contract entered into between LaVerne and Estel was illegal in that it was contrary to the contract entered into between LaVerne and the C.C.C. in which LaVerne was to terminate dairy production. LaVerne became a participant in the Dairy Termination Program, a government farm program administered by the C.C.C. The purpose of the program is to reduce the quantity of milk marketed for commercial use, thereby stabilizing milk prices, decreasing existing milk surplus, and lessening the cost of storing surplus dairy commodities. *See Lisbon Bank and Trust Co. v. Commodity Credit Corp.*, 679 F.Supp. 903, 904 (N.D.Iowa 1987).

Under the program, dairy farmers like LaVerne entered into contracts with the C.C.C. The contract required the dairy producer to either slaughter or sell his entire herd of dairy cattle by the end of the contract disposal period. The milk producer could not acquire any interest in any other dairy cattle or acquire a proprietary interest in any milk production facilities for a period of five years. *Lisbon* at 904. The question turns then to whether the contract between LaVerne and Estel is void as it circumvents the contract between LaVerne and the C.C.C. This court holds it does not.

■ It is well settled that a party to an illegal contract cannot have the contract enforced by the courts. *O'Conner v. Follman*, 747 S.W.2d 216, 222 (Mo.App.1988). The rule is that where parties charged with the knowledge of the law undertake to enter into an agreement in violation thereof, they will be left in the position in which they put themselves. *Id* at 221. Additionally, however, acts in violation of a statute will not be held void unless the law may be fairly construed to require that the acts be voided. *See State v. Haid*, 325 Mo. 949, 30 S.W.2d 100, 103–104 (1930).

Here, the contract between LaVerne and Estel and subsequent work and compensation paid are not the type of acts the C.C.C. contract seeks to prevent. The purpose behind the C.C.C. contract is to reduce the quantity of milk marketed, stabilize milk prices, decrease existing milk surplus, and lessen the cost of storing milk surplus. *Lisbon* at 904. Estel's contract in which he agreed to pay LaVerne $550 per month plus feed cost with LaVerne acting in the capacity of a hired hand does not circum-

vent the contract entered between LaVerne and the C.C.C.

Under the C.C.C. contract, LaVerne was not to obtain any interest in dairy production or in dairy cows. Interest in dairy production is defined by the C.C.C. contract as "sharing in the risk of production, or the proceeds, from the sale of milk." The uncontradicted testimony of LaVerne was that he was merely an employee of his father. LaVerne was entitled to specific wages of $555 a month and reimbursement for feed he supplied, *limited* to one-half of Estel's sales to Mid–American dairies. Any compensation owed to LaVerne was fixed and, therefore, LaVerne did not share in the risk of milk production.

The C.C.C. contract also prohibited LaVerne from having an interest in dairy cattle. The C.C.C. contract defines this as "any ownership or financial interest of any kind, whether present, future, or conditional, in dairy cattle, including any interest as a lessee or lessor." Dairy cattle is defined as "cows, heifers, and calves." While it is arguable that LaVerne did acquire proceeds to one-half the calf crop, such activity does not require that the contract between LaVerne and Estel be held void. *See State v. Haid, supra,* at 102–103.

The C.C.C. contract provides that penalties for violation are cumulative to criminal and/or civil liability under federal statutes. 7 C.F.R. § 1430.463 (1989), *citing* 18 U.S.C. §§ 286, 287, 371, 641, 1001; 15 U.S.C. § 714m; 31 U.S.C. § 3729. None of these statutes cited void, prohibit, or declare illegal any transaction by which a participating dairy farmer acquires an interest in the dairy cattle or the production of milk. All of these statutes relate to conspiracy, fraud, or the making of a false claim. The regulations regarding governing the Dairy Termination Program have identical provisions. 7 C.F.R. § 1430.463 (1989).

The Dairy Termination provides for assessment of a "marketing penalty" against a producer who later acquires interest in dairy cattle or milk production. The penalty is based on the support price for milk in effect during the period of production. 7 C.F.R. § 1430.460 (1989). A penalty may be assessed only after notice and hearing. *Id.*

Nowhere does the law declare the contract between the participant in the Dairy Termination Program and the C.C.C. void due to acquisition of dairy cattle by the participant. The violation of the C.C.C. contract which appellants urge LaVerne has made would be subject to the "marketing penalty" provided under the contract. Further,

[a]n inference of invalidity does not necessarily follow from the fact that a statute prescribes a penalty. If the penalty is imposed for the protection of the revenue, it may be presumed, in the absence of express prohibition, that the legislature only desired to make it expensive to the parties in proportion that it is unprofitable to the revenue, and that their contracts are not void. It would seem that in all cases the true rule is that the question is one of legislative intent and the courts will look to the language of the statute, the subject matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and if from all these it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the court will so hold and will construe the statute accordingly.

17 C.J.S. *Contract* § 202 (1963). It can be construed, therefore, that it was the intention of the federal government to make a violation of the contract expensive to dairy farmers and not to void the acquisition of dairy cattle, whether it be by contract, as in this case, or otherwise. *See Howell v. Connecticut Fire Ins. Co.,* 215 Mo.App. 386, 257 S.W. 178, 180 (1923).

The trial court did not abuse its discretion in awarding LaVerne Welch his due compensation, personal property and calf crop. LaVerne's contract with his father is a legal, enforceable contract, and, therefore, appellants' contentions in this respect are found to be without merit.

The second point appellants raise, in summary, is that the trial court erred in refusing to set over the lawn mower to the

widow, Opal Welch, as exempt property because § 474.250, RSMo 1986 declares the widow has ownership of household furniture, appliances, utensils and implements.

■ The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in their plain and ordinary meaning. *Wolff Shoe Co. v. Director of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988). The apparent intent of the legislature in allowing the surviving spouse certain household effects and articles of food was to provide a temporary support for surviving spouse and family. *In re Bernays' Estate*, 344 Mo. 135, 126 S.W.2d 209, 215 (1939) (interpreting the intent of §§ 106–111, RSMo 1929, since repealed, but was a forerunner to § 474.250, RSMo 1986).

■ "Household", given its plain, ordinary meaning is defined as "those who dwell under the same roof and compose a family." *Webster's New Collegiate Dictionary*, 1977. Household, for this court's purposes then, would pertain to those items directly related to the continual operation and function within the structure of the house itself. The statute provides "... all household electrical appliances, all household musical and other amusement instruments and all household and kitchen furniture, appliances, utensils and implements." § 474.250, RSMo 1986. Appellants urge that the riding lawn mower is exempt under "all household ... furniture, appliances, utensils and instruments." Given the definition of household, a lawn mower is certainly not furniture, an appliance, utensil, or implement that is directly related to the continual operation and function within the structure of the house itself.

To bolster their assertion, appellants state that since the judge awarded a picnic table and lawn chairs to the widow, the lawn mower should subsequently follow in the award. This reasoning is flawed. A picnic table and lawn chairs would fit under the definition of household furniture because those articles can be used within the structure of the house itself. A lawn mow-

er clearly cannot be used in a household given its plain and ordinary meaning.

Using the plain and ordinary meaning of the word "household", coupled with the legislative intent in enacting the statute, it is clear that a riding lawn mower is not exempt property under § 474.250, RSMo 1986. The trial court's decision on this point is also subject to the *Murphy v. Carron, supra,* standard. The trial court's interpretation of § 474.250, RSMo 1986 was not without support in evidence or law and, therefore, was not in error.

■ Lastly, appellants contend that the widow was entitled to more than the $1,000 maintenance awarded by the trial court. Section 474.260.1 provides in pertinent part:

In addition to the right to homestead allowance and exempt property, the surviving spouse is entitled to a reasonable allowance in money out of the estate for his maintenance during the period of one year after the death of the spouse, according to his previous standard of living, taking into account the condition of the estate of the deceased spouse. The court shall consider the aggregate value of all money and property passing to the surviving spouse or unmarried minor children by means described in section 474.163.

§ 474.260.1, RSMo 1986.

Appellant, Opal Welch, filed in a timely manner her application for a one-year allowance in the amount of $12,000. In support of her application, Opal set out in her pleading:

The aggregate value of all money or property derived from the decedent passing to the surviving spouse or unmarried minor children by means other than testate or intestate succession without full consideration in money or moneys worth, including any allowances which may be made in other jurisdictions and satisfied from property therein is $4,715.93.

After considering such aggregate value, the surviving spouse is entitled to a reasonable allowance of $12,000.00 in money out of the estate of decedent for maintenance of the surviving spouse during the

period for one year after the death of the spouse, according to the surviving spouse's previous standard of living.

The widow's evidence supporting her need for a $12,000 one-year allowance consisted of her testimony stating that she was asking for $12,000, that she worked as a cook in the Archie School District throughout the marriage, that she received a salary of $600.00 a month which was used by her and the decedent during their marriage, and that she received a joint bank account of $4,715.93 upon decedent's death. During cross-examination, Opal testified to one expense she will incur, a monthly house payment of $163.00 and that she needed something "to keep house with".

Opal also testified that, after her husband's death, she resided in the home owned solely by Estel from January 2, 1989, until sometime in June of that year. She had an income from Social Security of $400.00 monthly and no unusual or exceptional needs.

In making the maintenance award, the court considered:

> [S]he has taken all household goods and appliances including a large number of antiques, almost $5,000.00 of jointly owned funds and will receive one-third of the estate by electing to take against the will, rather than one-seventh [sic] as the decedent directed in his will.

The trial court had no evidence upon which to determine the widow required $12,000.00 maintenance. The widow's needs and expenses were left entirely to speculation and conjecture. By failing to offer substantial evidence of probative force in support of her application, appellant, Opal Welch, failed in her burden and did not establish evidence to support her case. *See, Sheridan v. Sunset Pools of St. Louis, Inc.,* 750 S.W.2d 639 (Mo.App.1988).

Recent case law dictates that the surviving spouse must have some evidence to support her application for maintenance. In *In re the Estate of Miles,* 612 S.W.2d 64 (Mo.App.1981), a surviving spouse testified that his expenses in the year following the death of his wife would be $18,965.00. The executor contested some of his expenses. Because the surviving spouse proved his expenses and the executor did not prove differently, the judgment as set out by the trial court was based upon substantial evidence. *In re Miles* at 65.

Here, appellant Opal Welch failed to provide evidence of her living expenses. There was a lack of substantial evidence to support an award larger than $1,000.00. The trial court was not in error on this point under the *Murphy v. Carron, supra,* standard.

The judgment is in all respects affirmed.

All concur.